*IC*

**FILED**

JUL 1 2 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

Rose Meacham
(full name of plaintiff or petitioner)

vs.

Roozbeh Kiani, New York University, et al.
(full name of defendant(s) or respondent(s))

**APPLICATION TO PROCEED
WITHOUT PREPAYING FEES OR
COSTS / FINANCIAL AFFIDAVIT
(NON-PRISONER CASE)**

Case number:

1:23-cv-09913

**Instructions:** Please answer every question. Do not leave blanks.
If the answer is "0" or "none," say so.

**Application:** I am one of the parties in this case. I believe that I am entitled to the relief I am requesting in this case. I am providing the following information under penalty of perjury in support of my request (check all that apply):

☒ to proceed *in forma pauperis* (IFP) (without prepaying fees or costs)

☒ to request an attorney

1. *Are you employed?*

   ☒ Yes   Name and address of employer: Albertans

   Total amount of monthly take-home pay: average $1100 (see attached evidence and pay stubs)

   ☐ No   Date(s) of last employment: _____ Last monthly take-home pay: _____

2. *If married, is your spouse employed?* ☒ Not married

   ☐ Yes   Name and address of spouse's employer: _____

   Total amount of spouse's monthly take-home pay: _____

   ☐ No   Date(s) of spouse's last employment: _____ Spouse's last monthly take-home pay: _____

3. *Other sources of income / money:* For the past 12 months, list the amount of money that you and/or your spouse have received from any of the following sources:

   *(list the 12-month total for each)*

   | | |
   |---|---|
   | Self-employment, business, or profession: | $ _____ |
   | Income from interest or dividends: | $ _____ |
   | Income from rent payments: | $ _____ |
   | Pensions, annuities, or life insurance: | $ _____ |
   | Disability or worker's compensation: | $ _____ |
   | Gifts (including deposits into any accounts in your name): | $ _____ |
   | Unemployment, public assistance, or welfare: | $ _____ |
   | Settlements or judgments (include any that are expected): | $ _____ |
   | **Any other source of money:** | $ _____ |

Rev. 2/2020

4. *Cash and bank accounts*: Do you and/or your spouse have any money in cash or in a checking or savings account? ☑Yes ☐ No  If yes, how much? *No savings*

*$70 in checking*

5. *Other assets*: Do you and/or your spouse own or have an interest in any real estate (including your home), stocks, bonds, other securities, retirement plans, automobiles, jewelry, or other valuable property (not including ordinary household furnishings and clothing)? ☐ Yes ☑No

If yes, list each item of property and state its approximate value:

_____

_____

_____

6. *Dependents*: Is anyone dependent on you and/or your spouse for support? ☐Yes ☑No

If yes, please list their names (for minor children, use only initials); relationship to you; and how much you and/or your spouse contribute toward their support each month:

_____

_____

7. *Debts and financial obligations*: List any amounts you owe to others: *I owe over $400,000 in student loans, which is part of the subject matter of this lawsuit. The loans are inhumane and debilitating — the loans were wrongfully put into default and the loan office has*

8. *Provide any other information that will help explain why you cannot afford to pay court fees/hire an attorney*: *Please see attached*

_____

_____

*admitted the mistake but refuses to correct the errors they made.*

**Declaration**: I declare under penalty of perjury that all of the information listed above is true and correct.

I understand that a false statement may result in dismissal of my claims or other sanctions.

Date: *6-30-2024*

_____
Applicant's signature

*Rose Meacham*
Printed name

Please find the attached pay stubs to show proof of my poverty level. You can see that one week I was taking the Police Exam to try to become a Chicago Police Officer, and only made about $95.

I have medical injuries from being assaulted, raped. I had to physically push the rapist off of me — first trying to push him off with my arms, and when I wasn't strong enough, then trying with my legs and feet. I was able to successfully stop the rapist but I have sustained injuries to my shoulder, wrist, neck, knee, foot, ankle, etc. and have had to pay out of pocket for medical expenses and crutches to even be able to properly walk, lift items, do work etc.

You can see that due to these injuries and character defamation in my career for

reporting rapists, abuse, sexual harassment, etc. I am now barely able to earn enough money to pay bills.

My rent alone is about $800 and I only make an average of $1,100 each month. I am now forced to pay for medical care and other expenses and do not have enough money. These events and the incidents outlined in my lawsuit have made me homeless and at one point I was suffering horribly, inhumanely. This lawsuit is my only chance to rectify these damages and harms done to me.

My student loans are over $400,000 and I am unable to pay these student loans or even my taxes without this court addressing these outstanding issues in this lawsuit. My student loans

have illegally defaulted so I am nott ever able to rent my own apartment due to the erroneous credit score that I was illegally given by the loan office. The loan office has refused to correct their error and now I have no credit, no ability to obtain housing and more.

The suffering is inhumane beyond description and I am unable to pay the court fees for this lawsuit.

I ask your Honour to please grant my In forma Pauperis (IFP) application so that I am able to move forward with this lawsuit.

Motion for Mediation
and IFP Application
I would also like to point
out that I applied
for Mediation for this
lawsuit on 12-29-2023
to try to resolve these
issues quickly and
without a costly public
trial - I would like
to make that request
once more, as it might
expedite the case
and cost less for the
State of Illinois.

Some of the details of
the case might also
not be suitable for the
General Public, as Scientific
Laboratory work will be
discussed in great detail,
and I am aware for
the need to keep some
of this confidential.

**Jewel Food Stores, Inc.**
**Associate Experience Center (AEC)**
20427 N 27th Avenue
Phoenix, AZ 85027-3241

| Pay Group: | 032 |
| Pay Begin Date: | 06/30/2024 |
| Pay End Date: | 07/06/2024 |

| Advice #: | 321-6174763 |
| Advice Date: | 07/11/2024 |

Rose Menchum
730 W Lake St
Chicago, IL 60661
XXX-XX-8912

| Employee ID: | 20567754 |
| Department: | 3376A347 |
| Location: | 3376A |
| Job Title: | Cashier Clerk |
| Pay Rate: | $16.200 Hourly |

| TAX DATA: | Federal | IL State |
|---|---|---|
| Tax Status: | Single | N/A |
| Claim Dep. Amt.: | | 0 |
| Other Income: | ✓ | |
| Deductions: | | |
| Extra Withholding: | | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular | 16.200 | 14.00 | 226.80 | 490.00 | 7,747.60 |
| Sunday Regular Hours | | | 0.00 | 119.50 | 1,888.10 |
| Holiday Worked | 16.200 | 4.00 | 64.80 | 11.75 | 187.25 |
| Overtime 1.5 | | | 0.00 | 1.25 | 29.63 |
| Total Hours Worked | | 18.00 | | 622.50 | |
| Night Premium | 0.500 | 1.00 | 0.50 | 28.00 | 14.00 |
| Holiday Worked Premium | 1.250 | 4.00 | 5.00 | 11.75 | 14.69 |
| Sincerely Thank You | | | 0.00 | | 45.88 |
| **TOTAL:** | | | **297.10** | | **9,897.15** |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 1.63 | 304.68 |
| Fed MED/EE | 4.30 | 143.94 |
| Fed OASDI/EE | 18.42 | 615.48 |
| IL Withholdng | 14.71 | 491.41 |
| **TOTAL:** | **39.06** | **1,555.51** |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Union Dues | 8.45 | 135.20 |
| Union Dues Arrears | 0.00 | 92.95 |
| Union Dues Initiation | 0.00 | 110.00 |
| **TOTAL:** | **8.45** | **338.15** |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| *TAXABLE | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 297.10 | 297.10 | 39.06 | 8.45 | 249.59 |
| YTD | 9,897.15 | 9,927.15 | 1,555.51 | 338.15 | 8,003.49 |

## LEAVE BALANCES

| | | |
|---|---|---|
| Birthday | 0.00 | Days |
| Float Holiday | 0.00 | Days |
| Vac - Current | 0.00 | Hours |

## NET PAY DISTRIBUTION

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #6174763 | Checking | XXXXXXXXXXX2205 | 249.59 |
| **TOTAL:** | | | **249.59** |

Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269

$1,100 each month on average

**Jewel Food Stores, Inc.**
**Associate Experience Center (AEC)**
20427 N 27th Avenue
Phoenix, AZ 85027-3241

| | |
|---|---|
| Pay Group: | 032 |
| Pay Begin Date: | 06/23/2024 |
| Pay End Date: | 06/29/2024 |

| | |
|---|---|
| Advice #: | 321-6152041 |
| Advice Date: | 07/03/2024 |

| TAX DATA: | Federal | IL State |
|---|---|---|
| Tax Status: | Single | N/A |
| Claim Dep. Amt.: | | 0 |
| Other Income: | | |
| Deductions: | | |
| Extra Withholding: | | |

Rose Meacham
730 W Lake St
Chicago, IL 60661
XXX-XX-8912

| | |
|---|---|
| Employee ID: | 20567754 |
| Department: | 3376A347 |
| Location: | 3376A |
| Job Title: | Cashier Clerk |
| Pay Rate: | $15.800 Hourly |

## HOURS AND EARNINGS

| | | Current | | YTD | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD |
| Regular | 15.800 | 23.50 | 371.30 | 476.00 | 7,520.80 | Fed Withholdng | 16.61 | 303.05 |
| Sunday Regular Hours | 15.800 | 4.75 | 75.05 | 119.50 | 1,888.10 | Fed MED/EE | 6.48 | 139.64 |
| Holiday Worked | | | 0.00 | 7.75 | 122.45 | Fed OASDI/EE | 27.70 | 597.06 |
| Overtime 1.5 | | | 0.00 | 1.25 | 29.63 | IL Withholdng | 22.12 | 476.70 |
| Total Hours Worked | | 28.25 | | 604.50 | | | | |
| Night Premium | 0.500 | 1.00 | 0.50 | 27.00 | 13.50 | | | |
| Holiday Worked Premium | | | 0.00 | 7.75 | 9.69 | | | |
| Sincerely Thank You | | | 0.00 | | 45.88 | | | |
| **TOTAL:** | | | **446.85** | | **9,600.05** | **TOTAL:** | **72.91** | **1,516.45** |

## TAXES

(see above, combined)

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| | | |
| **TOTAL:** | **0.00** | **0.00** |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Union Dues | 8.45 | 126.75 |
| Union Dues Arrears | 0.00 | 92.95 |
| Union Dues Initiation | 0.00 | 110.00 |
| **TOTAL:** | **8.45** | **329.70** |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| *TAXABLE | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 446.85 | 446.85 | 72.91 | 8.45 | 365.49 |
| YTD | 9,600.05 | 9,630.05 | 1,516.45 | 329.70 | 7,753.90 |

## LEAVE BALANCES

| | | |
|---|---|---|
| Birthday | 0.00 | Days |
| Float Holiday | 0.00 | Days |
| Vac - Current | 0.00 | Hours |

## NET PAY DISTRIBUTION

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #6152041 | Checking | XXXXXXXXXXX2205 | 365.49 |
| **TOTAL:** | | | **365.49** |

Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269

| Jewel Food Stores, Inc.<br>Associate Experience Center (AEC)<br>20427 N 27th Avenue<br>Phoenix, AZ 85027-3241 | Pay Group: 032<br>Pay Begin Date: 06/16/2024<br>Pay End Date: 06/22/2024 | | Advice #: 321-6129414<br>Advice Date: 06/27/2024 | |
|---|---|---|---|---|

| | | | TAX DATA: | Federal | IL State |
|---|---|---|---|---|---|
| Rose Meacham<br>730 W Lake St<br>Chicago, IL 60661<br>XXX-XX-8912 | Employee ID: 20567754<br>Department: 3376A347<br>Location: 3376A<br>Job Title: Cashier Clerk<br>Pay Rate: $15.800 Hourly | | Tax Status:<br>Claim Dep. Amt.:<br>Other Income:<br>Deductions:<br>Extra Withholding: | Single | N/A<br>0 |

### HOURS AND EARNINGS

| | | Current | | | YTD | | TAXES | | |
|---|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | | Current | YTD |
| Regular | | | 0.00 | 452.50 | 7,149.50 | Fed Withholdng | | 0.00 | 286.44 |
| Sunday Regular Hours | 15.800 | 7.50 | 118.50 | 114.75 | 1,813.05 | Fed MED/EE | | 1.72 | 133.16 |
| Holiday Worked | | 0.00 | | 7.75 | 122.45 | Fed OASDI/EE | | 7.35 | 569.36 |
| Overtime 1.5 | | 0.00 | | 1.25 | 29.63 | IL Withholdng | | 5.87 | 454.58 |
| Total Hours Worked | | 7.50 | | 576.25 | | | | | |
| Night Premium | | 0.00 | | 26.00 | 13.00 | | | | |
| Holiday Worked Premium | | 0.00 | | 7.75 | 9.69 | | | | |
| Sincerely Thank You | | 0.00 | | | 45.88 | | | | |
| **TOTAL:** | | | **118.50** | | **9,153.20** | **TOTAL:** | | **14.94** | **1,443.54** |

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
| | | | Union Dues | 8.45 | 118.30 | | | |
| | | | Union Dues Arrears | 0.00 | 92.95 | | | |
| | | | Union Dues Initiation | 0.00 | 110.00 | | | |
| **TOTAL:** | **0.00** | **0.00** | **TOTAL:** | **8.45** | **321.25** | ***TAXABLE** | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 118.50 | 118.50 | 14.94 | 8.45 | 95.11 |
| YTD | 9,153.20 | 9,183.20 | 1,443.54 | 321.25 | 7,388.41 |

| LEAVE BALANCES | | | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|
| Birthday | 0.00 | Days | Payment Type | Account Type | Account Number | Amount |
| Float Holiday | 0.00 | Days | Advice #6129414 | Checking | XXXXXXXXXXX2205 | 95.11 |
| Vac - Current | 0.00 | Hours | | | | |
| | | | **TOTAL:** | | | **95.11** |

**Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269**

Jewel Food Stores, Inc.
Associate Experience Center (AEC)
20427 N 27th Avenue
Phoenix, AZ 85027-3241

| Pay Group: | 032 |
| Pay Begin Date: | 06/09/2024 |
| Pay End Date: | 06/15/2024 |

| Advice #: | 321-6106859 |
| Advice Date: | 06/20/2024 |

Rose Meacham
730 W Lake St
Chicago, IL 60661
XXX-XX-8912

| Employee ID: | 20567754 |
| Department: | 3376A347 |
| Location: | 3376A |
| Job Title: | Cashier Clerk |
| Pay Rate: | $15.800 Hourly |

| TAX DATA: | Federal | IL State |
|---|---|---|
| Tax Status: | Single | N/A |
| Claim Dep. Amt.: | | 0 |
| Other Income: | | |
| Deductions: | | |
| Extra Withholding: | | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular | 15.800 | 23.25 | 367.35 | 452.50 | 7,149.50 |
| Sunday Regular Hours | 15.800 | 6.50 | 102.70 | 107.25 | 1,694.55 |
| Holiday Worked | | | 0.00 | 7.75 | 122.45 |
| Overtime 1.5 | 23.700 | 1.00 | 23.70 | 1.25 | 29.63 |
| Total Hours Worked | | 30.75 | | 568.75 | |
| Night Premium | 0.500 | 2.00 | 1.00 | 26.00 | 13.00 |
| Holiday Worked Premium | | | 0.00 | 7.75 | 9.69 |
| Sincerely Thank You | | | 0.00 | | 45.88 |
| **TOTAL:** | | | **494.75** | | **9,034.70** |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 21.40 | 286.44 |
| Fed MED/EE | 7.18 | 131.44 |
| Fed OASDI/EE | 30.67 | 562.01 |
| IL Withholdng | 24.49 | 448.71 |
| **TOTAL:** | **83.74** | **1,428.60** |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Union Dues | 8.45 | 109.85 |
| Union Dues Initiation | 4.28 | 110.00 |
| Union Dues Arrears | 0.00 | 92.95 |
| **TOTAL:** | **12.73** | **312.80** |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| *TAXABLE | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 494.75 | 494.75 | 83.74 | 12.73 | 398.28 |
| YTD | 9,034.70 | 9,064.70 | 1,428.60 | 312.80 | 7,293.30 |

## LEAVE BALANCES

| Birthday | 0.00 Days |
| Float Holiday | 0.00 Days |
| Vac - Current | 0.00 Hours |

## NET PAY DISTRIBUTION

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #6106859 | Checking | XXXXXXXXXXX2205 | 398.28 |
| **TOTAL:** | | | **398.28** |

Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269

**Jewel Food Stores, Inc.**
**Associate Experience Center (AEC)**
20427 N 27th Avenue
Phoenix, AZ 85027-3241

| Pay Group: | 032 |
| Pay Begin Date: | 06/02/2024 |
| Pay End Date: | 06/08/2024 |

| Advice #: | 321-6084350 |
| Advice Date: | 06/13/2024 |

| Rose Meacham | Employee ID: | 20567754 |
| 730 W Lake St | Department: | 3376A347 |
| Chicago, IL 60661 | Location: | 3376A |
| XXX-XX-8912 | Job Title: | Cashier Clerk |
| | Pay Rate: | $15.800 Hourly |

| TAX DATA: | Federal | IL State |
|---|---|---|
| Tax Status: | Single | N/A |
| Claim Dep. Amt.: | | 0 |
| Other Income: | | |
| Deductions: | | |
| Extra Withholding: | | |

## HOURS AND EARNINGS

| | | Current | | YTD | |
|---|---|---|---|---|---|
| **Description** | **Rate** | **Hours** | **Earnings** | **Hours** | **Earnings** |
| Regular | 15.800 | 16.50 | 260.70 | 429.25 | 6,782.15 |
| Sunday Regular Hours | 15.800 | 6.50 | 102.70 | 100.75 | 1,591.85 |
| Holiday Worked | | 0.00 | | 7.75 | 122.45 |
| Overtime 1.5 | | 0.00 | | 0.25 | 5.93 |
| Total Hours Worked | | 23.00 | | 538.00 | |
| Night Premium | | 0.00 | | 24.00 | 12.00 |
| Holiday Worked Premium | | 0.00 | | 7.75 | 9.69 |
| Sincerely Thank You | | 0.00 | | | 45.88 |
| **TOTAL:** | | | **363.40** | | **8,539.95** |

## TAXES

| **Description** | **Current** | **YTD** |
|---|---|---|
| Fed Withholdng | 8.26 | 265.04 |
| Fed MED/EE | 5.27 | 124.26 |
| Fed OASDI/EE | 22.53 | 531.34 |
| IL Withholdng | 17.99 | 424.22 |
| | | |
| **TOTAL:** | **54.05** | **1,344.86** |

## BEFORE-TAX DEDUCTIONS

| **Description** | **Current** | **YTD** |
|---|---|---|
| | | |
| **TOTAL:** | **0.00** | **0.00** |

## AFTER-TAX DEDUCTIONS

| **Description** | **Current** | **YTD** |
|---|---|---|
| Union Dues | 8.45 | 101.40 |
| Union Dues Initiation | 16.55 | 105.72 |
| Union Dues Arrears | 0.00 | 92.95 |
| **TOTAL:** | **25.00** | **300.07** |

## EMPLOYER PAID BENEFITS

| **Description** | **Current** | **YTD** |
|---|---|---|
| | | |
| *TAXABLE | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 363.40 | 363.40 | 54.05 | 25.00 | 284.35 |
| YTD | 8,539.95 | 8,569.95 | 1,344.86 | 300.07 | 6,895.02 |

## LEAVE BALANCES

| | | |
|---|---|---|
| Birthday | 0.00 | Days |
| Float Holiday | 0.00 | Days |
| Vac - Current | 0.00 | Hours |

## NET PAY DISTRIBUTION

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #6084350 | Checking | XXXXXXXXXXX2205 | 284.35 |
| **TOTAL:** | | | **284.35** |

**Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269**

| Jewel Food Stores, Inc.<br>Associate Experience Center (AEC)<br>20427 N 27th Avenue<br>Phoenix, AZ 85027-3241 | Pay Group:<br>Pay Begin Date:<br>Pay End Date: | 032<br>05/26/2024<br>06/01/2024 | | Advice #:<br>Advice Date: | 321-6061893<br>06/06/2024 | |
|---|---|---|---|---|---|---|

| | | | | TAX DATA: | Federal | IL State |
|---|---|---|---|---|---|---|
| Rose Meacham<br>730 W Lake St<br>Chicago, IL 60661<br>XXX-XX-8912 | Employee ID:<br>Department:<br>Location:<br>Job Title:<br>Pay Rate: | 20567754<br>3376A347<br>3376A<br>Cashier Clerk<br>$15.800 Hourly | | Tax Status:<br>Claim Dep. Amt.:<br>Other Income:<br>Deductions:<br>Extra Withholding: | Single | N/A<br>0 |

### HOURS AND EARNINGS

| | | Current | | YTD | | | TAXES | | |
|---|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD | |
| Regular | 15.800 | 7.50 | 118.50 | 412.75 | 6,521.45 | Fed Withholdng | 6.52 | 256.78 | |
| Sunday Regular Hours | 15.800 | 6.00 | 94.80 | 94.25 | 1,489.15 | Fed MED/EE | 5.01 | 118.99 | |
| Holiday Worked | 15.800 | 7.75 | 122.45 | 7.75 | 122.45 | Fed OASDI/EE | 21.45 | 508.81 | |
| Overtime 1.5 | | | 0.00 | 0.25 | 5.93 | IL Withholdng | 17.12 | 406.23 | |
| Total Hours Worked | | 21.25 | | 515.00 | | | | | |
| Night Premium | 0.500 | 1.00 | 0.50 | 24.00 | 12.00 | | | | |
| Holiday Worked Premium | 1.250 | 7.75 | 9.69 | 7.75 | 9.69 | | | | |
| Sincerely Thank You | | | 0.00 | | 45.88 | | | | |
| **TOTAL:** | | | **345.94** | | **8,176.55** | **TOTAL:** | **50.10** | **1,290.81** | |

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
| | | | Union Dues | 8.45 | 92.95 | | | |
| | | | Union Dues Initiation | 16.55 | 89.17 | | | |
| | | | Union Dues Arrears | 0.00 | 92.95 | | | |
| **TOTAL:** | **0.00** | **0.00** | **TOTAL:** | **25.00** | **275.00** | *TAXABLE | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 345.94 | 345.94 | 50.10 | 25.00 | 270.84 |
| YTD | 8,176.55 | 8,206.55 | 1,290.81 | 275.07 | 6,610.67 |

| LEAVE BALANCES | | | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|
| Birthday | 0.00 | Days | Payment Type | Account Type | Account Number | Amount |
| Float Holiday | 0.00 | Days | Advice #6061893 | Checking | XXXXXXXXXXX2205 | 270.84 |
| Vac - Current | 0.00 | Hours | | | | |
| | | | **TOTAL:** | | | **270.84** |

Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269

| Jewel Food Stores, Inc.<br>Associate Experience Center (AEC)<br>20427 N 27th Avenue<br>Phoenix, AZ 85027-3241 | Pay Group:<br>Pay Begin Date:<br>Pay End Date: | 032<br>05/19/2024<br>05/25/2024 | | Advice #:<br>Advice Date: | 321-6039413<br>05/30/2024 | |
|---|---|---|---|---|---|---|

| | | | | TAX DATA: | Federal | IL State |
|---|---|---|---|---|---|---|
| Rose Meacham<br>730 W Lake St<br>Chicago, IL 60661<br>XXX-XX-8912 | Employee ID:<br>Department:<br>Location:<br>Job Title:<br>Pay Rate: | 20567754<br>3376A347<br>3376A<br>Cashier Clerk<br>$15.800 Hourly | Tax Status:<br>Claim Dep. Amt.:<br>Other Income:<br>Deductions:<br>Extra Withholding: | Single | N/A<br>0 |

### HOURS AND EARNINGS

| Description | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Regular | 15.800 | 20.25 | 319.95 | 405.25 | 6,402.95 | Fed Withholdng | 11.13 | 250.26 |
| Sunday Regular Hours | 15.800 | 4.50 | 71.10 | 88.25 | 1,394.35 | Fed MED/EE | 5.69 | 113.98 |
| Overtime 1.5 | | 0.00 | | 0.25 | 5.93 | Fed OASDI/EE | 24.31 | 487.36 |
| Total Hours Worked | | 24.75 | | 493.75 | | IL Withholdng | 19.41 | 389.11 |
| Night Premium | 0.500 | 2.00 | | 1.00 | 11.50 | | | |
| Sincerely Thank You | | | 0.00 | | 45.88 | | | |
| **TOTAL:** | | | **392.05** | | **7,830.61** | **TOTAL:** | **60.54** | **1,240.71** |

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Union Dues | 8.45 | 84.50 |
| Union Dues Initiation | 16.55 | 72.62 |
| Union Dues Arrears | 0.00 | 92.95 |
| **TOTAL:** | **25.00** | **250.07** |

### EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| | | |

*TAXABLE

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 392.05 | 392.05 | 60.54 | 25.00 | 306.51 |
| YTD | 7,830.61 | 7,860.61 | 1,240.71 | 250.07 | 6,339.83 |

### LEAVE BALANCES

| | | |
|---|---|---|
| Birthday | 0.00 | Days |
| Float Holiday | 0.00 | Days |
| Vac - Current | 0.00 | Hours |

### NET PAY DISTRIBUTION

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #6039413 | Checking | XXXXXXXXXXX2205 | 306.51 |
| **TOTAL:** | | | **306.51** |

Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269

**Jewel Food Stores, Inc.**
**Associate Experience Center (AEC)**
20427 N 27th Avenue
Phoenix, AZ 85027-3241

| Pay Group: | 032 |
| Pay Begin Date: | 05/12/2024 |
| Pay End Date: | 05/18/2024 |

| Advice #: | 321-6017134 |
| Advice Date: | 05/23/2024 |

| TAX DATA: | Federal | IL State |
|---|---|---|
| Tax Status: | Single | N/A |
| Claim Dep. Amt.: | | 0 |
| Other Income: | | |
| Deductions: | | |
| Extra Withholding: | | |

Rose Mencham
730 W Lake St
Chicago, IL 60661
XXX-XX-8912

| Employee ID: | 20567754 |
| Department: | 3376A347 |
| Location: | 3376A |
| Job Title: | Cashier Clerk |
| Pay Rate: | $15.800 Hourly |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular | 15.800 | 16.50 | 260.70 | 385.00 | 6,083.00 |
| Sunday Regular Hours | 15.800 | 8.00 | 126.40 | 83.75 | 1,323.25 |
| Overtime 1.5 | | 0.00 | | 0.25 | 5.93 |
| Total Hours Worked | | 24.50 | | 469.00 | |
| Night Premium | 0.500 | 2.00 | 1.00 | 10.50 | |
| Sincerely Thank You | | | 0.00 | 21.00 | 45.88 |
| | | | | 0.00 | |
| **TOTAL:** | | | **388.10** | | **7,438.56** |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 10.73 | 239.13 |
| Fed MED/EE | 5.62 | 108.29 |
| Fed OASDI/EE | 24.06 | 463.05 |
| IL Withholdng | 19.21 | 369.70 |
| **TOTAL:** | **59.62** | **1,180.17** |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Union Dues | 8.45 | 76.05 |
| Union Dues Initiation | 16.55 | 56.07 |
| Union Dues Arrears | 0.00 | 92.95 |
| **TOTAL:** | **25.00** | **225.07** |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| *TAXABLE | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 388.10 | 388.10 | 59.62 | 25.00 | 303.48 |
| YTD | 7,438.56 | 7,468.56 | 1,180.17 | 225.07 | 6,033.32 |

## LEAVE BALANCES

| | | |
|---|---|---|
| Birthday | 0.00 | Days |
| Float Holiday | 0.00 | Days |
| Vac - Current | 0.00 | Hours |

## NET PAY DISTRIBUTION

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #6017134 | Checking | XXXXXXXXXXX2205 | 303.48 |
| **TOTAL:** | | | **303.48** |

**Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269**

| Jewel Food Stores, Inc.<br>Associate Experience Center (AEC)<br>20427 N 27th Avenue<br>Phoenix, AZ 85027-3241 | Pay Group: | 032 | | | |
|---|---|---|---|---|---|
| | Pay Begin Date: | 05/05/2024 | | Advice #: | 321-5994941 |
| | Pay End Date: | 05/11/2024 | | Advice Date: | 05/16/2024 |

| | | | | TAX DATA: | Federal | IL State |
|---|---|---|---|---|---|---|
| Rose Meacham<br>730 W Lake St<br>Chicago, IL 60661<br>XXX-XX-8912 | Employee ID: | 20567754 | | Tax Status: | Single | N/A |
| | Department: | 3376A347 | | Claim Dep. Amt.: | | 0 |
| | Location: | 3376A | | Other Income: | | |
| | Job Title: | Cashier Clerk | | Deductions: | | |
| | Pay Rate: | $15.800 Hourly | | Extra Withholding: | | |

### HOURS AND EARNINGS

| | | Current | | YTD | | | TAXES | | |
|---|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD |
| Regular | 15.800 | 18.00 | 284.40 | 368.50 | 5,822.30 | Fed Withholdng | 10.68 | 228.40 |
| Sunday Regular Hours | 15.800 | 6.50 | 102.70 | 75.75 | 1,196.85 | Fed MED/EE | 5.62 | 102.67 |
| Overtime 1.5 | | 0.00 | | 0.25 | 5.93 | Fed OASDI/EE | 24.03 | 438.99 |
| Total Hours Worked | | 24.50 | | 444.50 | | IL Withholdng | 19.19 | 350.49 |
| Night Premium | 0.500 | 1.00 | | 0.50 | 9.50 | | | |
| Sincerely Thank You | | | | 0.00 | 45.88 | | | |
| **TOTAL:** | | | **387.60** | | **7,050.46** | **TOTAL:** | **59.52** | **1,120.55** |

### BEFORE-TAX DEDUCTIONS / AFTER-TAX DEDUCTIONS / EMPLOYER PAID BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| | | | Union Dues | 8.45 | 67.60 | | | |
| | | | Union Dues Initiation | 12.36 | 39.52 | | | |
| | | | Union Dues Arrears | 4.19 | 92.95 | | | |
| **TOTAL:** | **0.00** | **0.00** | **TOTAL:** | **25.00** | **200.07** | ***TAXABLE** | | |

| | TOTAL GROSS PAY | FED TAXABLE GROSS PAY | TOTAL TAX DEDUCTIONS | TOTAL OTHER DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 387.60 | 387.60 | 59.52 | 25.00 | 303.08 |
| YTD | 7,050.46 | 7,080.46 | 1,120.55 | 200.07 | 5,729.84 |

| LEAVE BALANCES | | | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|
| Birthday | 0.00 | Days | Payment Type | Account Type | Account Number | Amount |
| Float Holiday | 0.00 | Days | Advice #5994941 | Checking | XXXXXXXXXXX2205 | 303.08 |
| Vac - Current | 0.00 | Hours | | | | |
| | | | **TOTAL:** | | | **303.08** |

Employer: Jewel Food Stores, Inc., 250 E Parkcenter Blvd, Boise, Idaho 83706. AEC Phone: 888-255-2269

Civil

To give context of the sentiment and mercilessness, anger, prejudice towards poor people in America right now, I have attached the following evidence.

People are made poor and then mercilessly punished for being made poor.

People have a mercilessness towards the suffering of others, towards the suffering of poor people, homeless people that is shameful and horrible.

People are trying to make homelessness a crime. And people in America will do anything to get money so they are not poor.

My lawsuits show evidence about what happens to people when

they are poor and do not
have money.

My lawsuits show inhumane
rights abuses perpetrated
against the poor, homeless,
suffering people — and my
lawsuit shows why the
Students, employees stay
quiet and are unable to
report crimes in their positions,
because their jobs are
threatened, and their careers
are threatened. My lawsuit
shows evidence to prove what
happens to Students, Employees
when we report crimes — and
how the suffering and retaliation
is so inhumane people remain
silent, and do not report.



SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

**DONATE**

Avantor
Setting Science in Motion
Open
Enabling customer innovation

**AP**

Biden-Trump debate    Photos: Watching the debate    Iran votes    Israel-Hamas war    Bronny Jam

POLITICS

# Supreme Court allows cities to enforce bans on homeless people sleeping outside



BY **LINDSAY WHITEHURST**
Updated 12:39 PM CDT, June 28, 2024

WASHINGTON (AP) — The Supreme Court cleared the way for cities to enforce bans on homeless people sleeping outside in public places on Friday, overturning a California appeals court ruling that found such laws amount to cruel and unusual punishment when shelter space is lacking.

The case is the most significant to come before the high court in decades on the issue and comes as a rising number of people in the U.S. are without a permanent place to live.

In a 6-3 decision along ideological lines, the high court found that outdoor sleeping bans don't violate the Eighth Amendment.

Western cities had argued that the ruling made it harder to manage outdoor encampments in public spaces, but homeless advocates said punishing people who need a place to sleep would criminalize homelessness.

In California, which is home to one-third of the country's homeless population, Democratic Gov. Gavin Newsom said the decision gives state and local officials authority to clear "unsafe encampments" from the streets under policies that respect fundamental human needs. "This decision removes the legal ambiguities that have tied the hands of local officials for years," he said.

ADVERTISEMENT

Justice Neil Gorsuch acknowledged those concerns in the opinion he wrote for the majority.

**RELATED COVERAGE**





**Justice John Roberts says the Supreme Court's last decisions of this term are coming on Monday**



**Supreme Court makes it harder to charge Capitol riot defendants with obstruction, charge Trump faces**



**The Supreme Court weakens federal regulators, overturning decades-old Chevron decision**

"Homelessness is complex. Its causes are many. So may be the public policy responses required to address it," he wrote. "A handful of federal judges cannot begin to 'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness."

He suggested that people who have no choice but to sleep outdoors could raise that as a "necessity defense," if they are ticketed or otherwise punished for violating a camping ban.

Homeless advocates, on the other hand, have said that allowing cities to punish people who need a place to sleep would ultimately make the crisis worse. Cities had been allowed to regulate encampments under a U.S. 9th Circuit Court of Appeals ruling but couldn't completely bar people from sleeping outdoors.

ADVERTISEMENT

"Sleep is a biological necessity, not a crime," said Justice Sonia Sotomayor, reading from the bench a dissent joined by her liberal colleagues. "Homelessness is a reality for so many Americans."

Punishing people for something they can't control, like homelessness, is cruel and unusual, she said. She warned that striking down Eighth Amendment arguments against camping bans likely won't end the fights over the ordinances in court.

Los Angeles Mayor Karen Bass, a Democrat, criticized the majority ruling, saying cities shouldn't "attempt to arrest their way out of this problem or hide the homelessness crisis in neighboring cities or in jail." The only way to truly address it, she said, is to connect people with housing and services.

The case came from the rural Oregon town of Grants Pass, which appealed a ruling striking down local ordinances that fined people $295 for sleeping outside after tents began crowding public parks. The 9th Circuit Court of Appeals, which has jurisdiction over the nine Western states, has held since 2018 that such bans violate the Eighth Amendment in areas where there aren't enough shelter beds.

ADVERTISEMENT

Grants Pass Mayor Sara Bristol told The Associated Press that the city will not immediately start enforcing those local ordinances fining people for sleeping outside and that the city council will need to review the decision and determine the next steps.

"This lawsuit was about whether cities have a right to enforce camping restrictions in public spaces, and I'm relieved that Grants Pass will be able to reclaim our city parks for recreation," said Bristol, who serves in a nonpartisan position. "Homelessness is a complex issue, and our community has been trying to find solutions."

Attorney Theane Evangelis, who represented Grants Pass before the high court, applauded the ruling, saying the 9th Circuit decision had "tied the hands of local governments."

"Years from now, I hope that we will look back on today's watershed ruling as the turning point in America's homelessness crisis," she said.

ADVERTISEMENT



Max · Sponsored

**Now Streaming**

**Sign Up** >

In Portland, though, a spokesperson for the mayor's office said the effect of the ruling would likely be muted since the state has separate legal limits on how cities can manage encampments. Seattle officials also expected a limited impact.

An attorney for homeless people who live in the town bemoaned the decision.

"We are disappointed that a majority of the court has decided that our Constitution allows a city to punish its homeless residents simply for sleeping outside with a blanket to survive the cold when there is nowhere else for them to go," said Ed Johnson, director of litigation at the Oregon Law Center.

Friday's ruling comes after homelessness in the United States grew a dramatic 12% last year to its highest reported level, as soaring rents and a decline in coronavirus pandemic assistance combined to put housing out of reach for more people.

ADVERTISEMENT



N Nespresso - Sponsored

**Taste the Summer Memories with Nespresso Coffee...**

**Discover More**                                    >

More than 650,000 people are estimated to be homeless, the most since the country began using a yearly point-in-time survey in 2007. A lack of access to mental health and addiction resources can contribute to the crisis. Older adults, LGBTQ+ people and people of color are disproportionately affected by homelessness, advocates said.

Nearly half of people without housing sleep outside, federal data shows.

Derrick Belgarde, executive director of the Chief Seattle Club, a nonprofit that provides shelter, housing and other resources for Native Americans, said there's a reason people may choose to sleep outside, explaining that before his organization was started members of the Native American population in the area weren't using shelters because they didn't feel safe in them or feel as though they belonged.

"I think it's going to cause a lot of pain, a lot of misery to deny people the right to safety, to feel safe, to feel a sense of belonging. It's going to be devastating for a lot of people," said Belgarde, a member of the Confederated Tribes of Siletz Indians.

The 9th Circuit decision had governed nine states: Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon and Washington.

———

Associated Press writers Rebecca Santana in Washington, D.C., John Antczak in Los Angeles, Hallie Golden in Seattle and Adam Beam in Sacramento, Calif., contributed to this story.

———

Follow the AP's coverage of the U.S. Supreme Court at https://apnews.com/hub/us-supreme-court.



**LINDSAY WHITEHURST**

Whitehurst is a national criminal justice reporter for The Associated Press, based in Washington, D.C. She covers the Justice Department, public safety and legal issues.



**PAID FOR BY FESTIVAL COUNTRY INDIANA**

**Spring is the Best Time to Explore Festival Country**









SUPREME COURT OF THE UNITED STATES BLOG

# Justices uphold laws targeting homelessness with criminal penalties

AMY HOWE JUN 28, 2024 1:48 PM

[Share](#)

*This article was updated on June 28 at 5:46 p.m.*

The Supreme Court on Friday upheld ordinances in a southwest Oregon city that prohibit people who are homeless from using blankets, pillows, or cardboard boxes for protection from the elements while sleeping within the city limits. By a vote of 6–3, the justices agreed with the city, Grants Pass, that the ordinances simply bar camping on public property by everyone and do not violate the Constitution's ban on cruel and unusual punishment.

Writing for the majority, Justice Neil Gorsuch contended that the Eighth Amendment, which bans cruel and unusual punishment, "serves many important functions, but it does not authorize federal judges" to "dictate this Nation's homelessness policy." Instead, he suggested, such a task should fall to the American people.

Justice Sonia Sotomayor dissented, in an opinion joined by Justices Elena Kagan and Ketanji Brown Jackson. She argued that the majority's ruling "focuses almost exclusively on the needs of local government and leaves the most vulnerable in our society with an impossible choice: Either stay awake or be arrested."

Friday's decision was a major ruling on homelessness that is likely to have an effect

well beyond Grants Pass. According to the U.S. Department of Housing and Urban Development, more than 600,000 people were homeless in the United States on a single night in 2023. In response to the increase in the number of people who are homeless, other state and local governments have passed similar bans on "camping" in recent years.

Grants Pass, a city with just under 40,000 people, has as many as 600 people experiencing homelessness on any given night. In 2013, the city decided to increase enforcement of existing ordinances that bar the use of blankets, pillows, and cardboard boxes while sleeping within the city.

Violators face steep fines: $295, which increases to $537.60 if it is not paid. When individuals receive two citations, police in Grants Pass can issue an order banning them from city property; anyone who violates such an order can be convicted on criminal trespass charges, which carry penalties of up to 30 days in jail and a $1,250 fine.

In 2018, John Logan and Gloria Johnson, both of whom have been homeless in Grants Pass, challenged the constitutionality of the city's ordinances. A federal district court agreed with them and barred the city from enforcing the ordinances at night and under some circumstances during the day.

The city appealed to the U.S. Court of Appeals for the 9th Circuit, which upheld the lower court's ruling. It relied on its 2018 decision in *Martin v. City of Boise*, in which it held that the Eighth Amendment's ban on cruel and unusual punishment bars the imposition of criminal penalties for sitting and sleeping outside by people experiencing homelessness who do not have access to shelter.

On Friday, the Supreme Court reversed. In his opinion for the court, Gorsuch stressed that the Eighth Amendment's ban on cruel and unusual punishment has generally applied only to methods of punishment, rather than to whether the government can criminalize particular conduct. And the fines and jail sentences at issue in this case do not, he insisted, "qualify as cruel and unusual."

Instead, he continued, the challengers point to the Supreme Court's 1962 decision in

*Robinson v. California*, holding that the Eighth Amendment bars a state from making it a crime simply to be a drug addict. But the kinds of public camping ordinances at issue in this case bear no resemblance to the state law in *Robinson*, Gorsuch wrote, because they criminalize camping on public property rather than a person's status.

The majority declined to extend Robinson to prohibit the enforcement of laws that (like the ordinances at issue in this case) do not criminalize an individual's status but instead prohibit acts that the defendant "cannot help but undertake." Otherwise, the challengers had suggested, the city would effectively be punishing for their status anyway.

The Supreme Court rejected a similar request to extend *Robinson* in 1968, Gorsuch explained. In *Powell v. Texas*, the court rebuffed a challenge by a defendant who had been convicted under a state law that made it a crime to be intoxicated in public. The defendant in that case had argued "that his drunkenness was an 'involuntary' byproduct of his status as an alcoholic." "This case," Gorsuch concluded, "is no different from *Powell*."

Gorsuch also suggested that there are other protections available in the legal system for individuals experiencing homelessness who might otherwise be subject to the city's ordinances. Among other things, he observed, an individual experiencing homelessness who does not have anywhere else to go may be able to assert a "necessity" defense, while an Oregon law restricts the power of the state's cities to punish their homeless residents for sleeping in public.

And although the 9th Circuit's decision in *Martin* may have been "well-intended," Gorsuch observed, it has spawned a variety of problems for cities in the West. For example, the requirement that cities to allow public camping by individuals who are "involuntarily" homeless, Gorsuch said, creates questions and uncertainty for city officials and police officers. Moreover, he noted, some cities have indicated that the ruling "has made it more difficult, not less, to help the homeless accept shelter off city streets."

Gorsuch acknowledged that homelessness is a "complex" issue and that, in trying to

address it, "people will disagree over which policy responses are best" and "may experiment with one set of approaches only to find later another set works better." "But in our democracy," he concluded, "that is their right."

Justice Clarence Thomas filed a brief concurring opinion in which he voiced his belief that *Robinson* (and much of the court's Eighth Amendment case law more broadly) was wrongly decided. Instead of considering the text and original meaning of the Eighth Amendment, he asserted, the court in *Robinson* looked at public opinion – which "is not an appropriate metric for interpreting the Cruel and Unusual Punishments Clause."

Moreover, Thomas expressed doubt about whether the cruel and unusual punishments clause even applies to this case. Although individuals experiencing homelessness in Grants Pass can eventually be exposed to criminal penalties, he acknowledged, "the possibility that a civil fine turns into a criminal trespass charge is a remote one." The challengers in this case, he wrote, "assert that they have been involuntarily homeless in Grants Pass for years, yet they have never received a park exclusion order, much less a criminal trespass charge."

In her dissent, Sotomayor began by stressing the scope of the homelessness problem in America, calling it a "complex and heartbreaking crisis." The problem stems, she explained, from a variety of "interconnected issues, including crippling debt and stagnant wages; domestic and sexual abuse; physical and psychiatric disabilities; and rising housing costs coupled with declining affordable housing options."

Sotomayor acknowledged that to address the "immense challenges" created by the homelessness problem, "local governments need wide latitude." And the 9th Circuit's decision in this case gives them that latitude, she contended, by allowing them to punish littering, drug use, harassment, and public urination and defecation. "The only question" before the Supreme Court in this case, she contended, "is whether the Constitution permits punishing homeless people with no access to shelter for sleeping in public with as little as a blanket to keep warm." The answer to that question, in her view, is "no."

The majority reaches the opposite conclusion, Sotomayor argued, by misunderstanding *Robinson*. The ordinances at the center of this case "criminalize being homeless," she wrote.

Moreover, Sotomayor suggested, the majority's concern that upholding the lower court's ruling would create too many "difficult questions," such as whether someone is "involuntarily" homeless, is unfounded. "Ultimately," Sotomayor said, "these are not metaphysical questions but factual ones." But in any event, she continued, "[j]ust because the majority can list difficult questions that require answers does not absolve federal judges of the responsibility to interpret and enforce the substantive bounds of the Constitution."

Sotomayor wrote that she "remain[ed] hopeful that someday in the near future, this Court will play its role in safeguarding constitutional liberties for the most vulnerable among us," but that, in her view, the court "today abdicates that role."

*This article was [originally published at Howe on the Court](#).*

    

Posted in: [Featured](#), [Merits Cases](#)

[CLICK HERE FOR FULL VERSION OF THIS STORY](#)

**Featured Articles**



**USA TODAY**

---

# 'Stay awake or be arrested': Sotomayor's passionate dissent in homeless encampments case

**Eduardo Cuevas** and **Maureen Groppe**  USA TODAY

Published 3:20 p.m. ET June 28, 2024 | **Updated 5:52 p.m. ET June 28, 2024**

Unconscionable and unconstitutional.

That's how Justice Sonia Sotomayor on Friday described punishing people for sleeping outside when they have no where else to go.

"Sleep is a biological necessity, not a crime," she wrote in her dissent of the Supreme Court's decision upholding an Oregon city's anti-camping ordinance aimed at preventing homeless settlements.

To emphasize her opposition, Sotomayor read her dissent from the bench. It was not the first time in recent weeks she has taken to the bench as the voice of the court's liberal wing, including one that she argued could undermine same-sex marriage.

On Friday, she accused the majority of focusing almost entirely on the needs of local governments and not enough on "the most vulnerable in our society."

**Prep for the polls:** See who is running for president and compare where they stand on key issues in our Voter Guide

**More:** 'You have to shed the tears': Justice shares that she cries after some Supreme Court cases

Sotomayor shared some of their stories, including a Nashville man who had trouble securing housing because he had been frequently arrested for being homeless. His outreach worker gave him a T-shirt that read: "Please do not arrest me, my outreach worker is working on my housing."

Sotomayor said the majority was deluding itself in finding that the Oregon city of Grants Pass didn't criminalize the state of being homeless because the camping prohibitions apply to actions, not people.

**More:** One big happy 'family'? Supreme Court justices talk of unity as they weigh explosive cases

"Under the city's laws," Justice Neil Gorsuch wrote for the majority, "it makes no difference whether the charged defendant is homeless, a backpacker on vacation passing through town, or a student who abandons his dorm room to camp out in protest on the lawn of a municipal building."

That view, Sotomayor wrote, "describes a fantasy."

In reality, she said, only the homeless are being ticketed.

Sotomayor, one of three liberal justices who opposed the ruling, said the majority ignored the half a million Americans who live unsheltered every night. She said punishing people for being homeless is 'cruel and unusual' under the Eight Amendment."

**Grants Pass, Oregon:** In major decision, Supreme Court allows cities to ban homeless camps

While acknowledging the difficult task faced by local governments responding to the housing crisis, Sotomayor said people experience homelessness for "complex and interconnected issues" that range from stagnant wages and rising housing costs, to domestic abuse and psychiatric disabilities.

Criminalizing homelessness, she said, can cause a "destabilizing cascade of harm" that includes losing personal documents or identification when encampments are cleared. It also leads to unpaid fines and incarceration that can result in losing work, benefits or housing opportunities.

Sotomayor, who grew up in public housing in the South Bronx, concluded society will come together to address the nation's homelessness crisis.

"I remain hopeful that someday in the near future, this Court will play its role in safeguarding constitutional liberties for the most vulnerable among us," she said.

On Friday, she concluded, the court had abdicated that role.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEVEN SALAITA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )      Case No. _____ |
| v. | ) |
| | ) |
| CHRISTOPHER KENNEDY, Chairman | ) |
| of the Board of Trustees of the University | ) |
| of Illinois; RICARDO ESTRADA, | ) |
| Trustee of the University of Illinois; | ) |
| PATRICK J. FITZGERALD, Trustee of | ) |
| the University of Illinois; KAREN | ) |
| HASARA, Trustee of the University of | )      JURY TRIAL DEMANDED |
| Illinois; PATRICIA BROWN HOLMES, | ) |
| Trustee of the University of Illinois; | ) |
| TIMOTHY KORITZ, Trustee of the | ) |
| University of Illinois; EDWARD L. | ) |
| MCMILLAN, Trustee of the University of | ) |
| Illinois; PAM STROBEL, Trustee of the | ) |
| University of Illinois; ROBERT EASTER, | ) |
| President of the University of Illinois; | ) |
| CHRISTOPHE PIERRE, Vice President | ) |
| of the University of Illinois; PHYLLIS | ) |
| WISE, Chancellor of the University of | ) |
| Illinois; THE BOARD OF TRUSTEES | ) |
| OF THE UNIVERSITY OF ILLINOIS; | ) |
| and JOHN DOE UNKNOWN DONORS | ) |
| TO THE UNIVERSITY OF ILLINOIS, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Case: 1:23-cv-09993 Document #: 21 Filed: 07/29/14 Page 34 of 85 PageID #:422

## COMPLAINT

NOW COMES Plaintiff, STEVEN SALAITA, by his attorneys LOEVY & LOEVY and the CENTER FOR CONSTITUTIONAL RIGHTS, and complaining of Defendants CHRISTOPHER KENNEDY; RICARDO ESTRADA; PATRICK J. FITZGERALD; KAREN HASARA; PATRICIA BROWN HOLMES; TIMOTHY KORITZ; EDWARD L. MCMILLAN; PAM STROBEL; ROBERT EASTER; CHRISTOPHE PIERRE; PHYLLIS WISE; THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS; and UNKNOWN DONORS TO THE UNIVERSITY OF ILLINOIS, states as follows:

### Introduction

1.     Professor Steven Salaita, an American academic with an expertise in Native American and Indigenous Studies, exercised his First Amendment right as a citizen to speak publicly on political and humanitarian issues that have been debated fiercely in this country and around the world. For voicing his views, the administrators of the University of Illinois—through defendants Chancellor Wise, President Easter, Vice President Pierre, and members of the Board of Trustees (collectively hereinafter "University Administration" or "the Administration")—suddenly and summarily dismissed him from a tenured faculty position.

2.     These officials did so after duly authorized University personnel recruited Professor Salaita and fully vetted his scholarship and prior teaching evaluations; after he formally accepted the University's offer of a tenured faculty position in its American Indian Studies Program; and after it induced him to rely on its contractual promise to resign from his tenured faculty position at another university. It did so despite Professor Salaita's stellar academic credentials and without notice or due process. No one—not even the University Administration—disputes the fact that it acted based on Professor Salaita's speech.

2

3.      The speech at issue consists of messages critical of Israeli policy that Professor

Salaita posted to his personal Twitter account in July 2014, after the state of Israel launched

"Operation Protective Edge," an aerial bombardment and ground campaign in the Gaza Strip.

Professor Salaita saw the news images of Palestinian children killed and felt compelled to speak

out. He did so by posting Twitter messages critical of the Israeli government and its political

leaders, and highlighting the impact of its policies. In the United States, Professor Salaita's

criticisms of Israeli state policy are infrequently heard from American politicians or presented in

the mainstream national media. The University Administration, facing pressure from wealthy

University donors, fired Professor Salaita for his political speech challenging the prevailing norm.

4.      Through its actions, the University Administration not only violated Professor

Salaita's constitutional right to free speech, they also trampled on long-cherished principles of

academic freedom and shared faculty-administration governance of the University. For these

reasons, the University has faced near-universal condemnation from within the academic

community. For example, the University's Senate Committee on Academic Freedom and Tenure

concluded that Salaita's termination violated principles of academic freedom and violated

Professor Salaita's due process rights; sixteen academic departments within the University have

voted "no-confidence" in the Administration; more than 5,000 academics from around the country

have pledged to boycott the University, resulting in the cancellation of more than three dozen

scheduled talks and conferences at the University and jeopardizing job searches across the

University; and a number of the most important nationwide academic organizations in the country

have condemned the University Administration for its improper treatment of Professor Salaita,

including:

- American Association of University Professors

3

- Modern Language Association

- American Anthropological Association

- American Historical Association

- American Philosophical Association

- American Sociological Association

- American Studies Association

- Society of American Law Teachers

5.      Professor Salaita has suffered severe economic, emotional, and reputational damage as a result of the wrongful conduct of the University, the above-named University officials, and the donors to the University who demanded that the University break its contract with Professor Salaita. Professor Salaita's prominent scholarship and excellent teaching credentials had allowed him to obtain a lifetime-tenured faculty position at a major American university—the pinnacle achievement for an academic. Having relied on the University appointing him to its faculty with tenure, he surrendered his prior tenured position. He has also been denied the opportunity to teach, is jobless and without tenure, and his academic career is in shambles. Moreover, without a university affiliation, Professor Salaita suffers irreparable harm since, among other things, his ability to publish articles in academic journals and to present his scholarship to his colleagues is severely diminished. The scholarly activities of which he has been deprived are the lifeblood of his profession, and crucial to the trajectory of his once flourishing academic career.

6.      Plaintiff Steven Salaita brings this action under 42 U.S.C. § 1983 and § 1985, and state law. He seeks equitable and monetary relief for violations of his constitutional rights, including free speech and due process, and for breach of contract, promissory estoppel, tortious

4

interference with contractual and business relations, intentional infliction of emotional distress and spoliation.

<h2 style="text-align:center">The Parties</h2>

7.      Plaintiff STEVEN SALAITA is a resident of the state of Virginia.

8.      Defendant THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS (the "BOARD OF TRUSTEES" or "BOARD") is an Illinois corporation, commonly referred to as the University of Illinois. The Board of Trustees has a role in the academic hiring process. At all times relevant to the actions described in this Complaint, the BOARD OF TRUSTEES was acting under color of law.

9.      For the 2013 fiscal year, the University of Illinois (through the Board) received approximately 12% of the money needed to fund its operations from the State of Illinois. Larger funding sources to the University included student tuition and fees, and federal grants and contracts. Since 2009, the University has received more funding from student tuition and fees than from the State of Illinois; and since 2010, the University has received more funding from the federal government than from the State of Illinois. The Board of Trustees is not protected by state sovereign immunity under the Eleventh Amendment.

10.     Defendants CHRISTOPHER KENNEDY, RICARDO ESTRADA, PATRICK FITZGERALD, KAREN HASARA, PATRICIA BROWN HOLMES, TIMOTHY KORITZ, EDWARD McMILLAN, and PAM STROBEL are members of the Board of Trustees of the University of Illinois (collectively, the "Trustee Defendants") and are all residents of Illinois. They each voted for, facilitated and approved Professor Salaita's firing.

11.     Defendant ROBERT EASTER is the President of the University of Illinois and a resident of Illinois. He facilitated, recommended and approved Professor Salaita's firing.

5

12.      Defendant CHRISTOPHE PIERRE is the Vice President for Academic Affairs of the University of Illinois and a resident of Illinois. He facilitated, recommended and approved Professor Salaita's firing.

13.      Defendant PHYLLIS WISE is the Chancellor of the University of Illinois at Urbana-Champaign and a resident of Illinois. She facilitated, recommended and approved Professor Salaita's firing.

14.      Each of the individual Defendants listed above, all Board of Trustee members or senior officials at the University of Illinois, is sued in his or her official capacity for equitable and injunctive relief, and monetary damages because the University is not entitled to sovereign immunity. Each of the individual Defendants above is also sued in his or her individual capacity. And each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this complaint.

15.      Defendants JOHN DOE DONORS TO THE UNIVERSITY OF ILLINOIS are unknown contributors to the University who threatened future donations to pressure the University to terminate Professor Salaita. They each communicated with University officials regarding Steven Salaita's employment and demanded that the University breach its contractual obligations and promises to Professor Salaita or else they would withhold financial contributions to the University.

### Jurisdiction and Venue

16.      This Court has jurisdiction over this action under 28 U.S.C § 1331 because Counts I, II and III of this action arise under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. This Court also has jurisdiction under 28 U.S.C. § 1332: Professor Salaita is a citizen of Virginia, all of the named Defendants are citizens of Illinois, and the amount in controversy exceeds $75,000.

6

17.     Venue is proper under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district. The Board of Trustees' meeting to discuss Professor Salaita's tweets and to support a decision to terminate Professor Salaita's appointment occurred in Chicago, on July 24, 2014. All of the Trustee Defendants, with the exception of Trustee Defendant Estrada, were present at that Chicago meeting; Defendants Wise, Easter and Pierre were also in attendance. The University also has a Chicago campus, and nearly all of the Trustee Defendants work and reside in this district.  Moreover, as set forth below, Steven Miller, a wealthy University donor, resides and works in Chicago, and exchanged correspondence with Defendant Wise on July 23 and July 24 about Professor Salaita. Chancellor Wise and Miller later met in Chicago on the morning of August 1 to discuss Professor Salaita's appointment. That same day, Chancellor Wise prepared a letter informing Salaita that he would not be appointed.

## General Allegations

### *Professor Salaita's Qualifications*

18.     Professor Salaita is a nationally recognized scholar on the effects of colonization on indigenous people. He earned his undergraduate degree in political science and his Master's degree in English from Radford University in Virginia. He then earned a Ph.D. at the University of Oklahoma in English with a concentration in Native American Studies and Theory and Modernity in 2003. He worked as an Assistant Professor at the University of Wisconsin-Whitewater, teaching American and ethnic American literature, from 2003 to 2006. In 2006, he was hired by Virginia Tech's English Department. He earned a lifetime tenured position three years later. He was, at the age of 33, a fully-tenured professor of English and scholar in Native American Studies.

19.     Professor Salaita has been an extremely prolific academic, writing and publishing widely and frequently. He has written six books; been published in top refereed journals; written

7

dozens of other journal articles, book chapters, and book reviews; and given dozens more conference presentations and invited lectures. Based on his scholarship, Professor Salaita received the Myers Center Outstanding Book Award in 2007, was a finalist for the Hiett Prize in the Humanities in 2008, and received the RAWI Distinguished Service Award in 2010.

*Professor Salaita Is Recruited by the University Of Illinois*

20.     In late 2012, the American Indian Studies Program at the University of Illinois at Urbana-Champaign began the rigorous search process to hire a new full-time faculty member. The Program's acting director, Professor Jodi Byrd, assisted by an academic search committee, cast a wide net, advertising the position across the country.

21.     This broad search resulted in dozens of applications, including one from Professor Steven Salaita. Professor Salaita's submission included a cover letter, curriculum vitae, and names of references. This initial material was later supplemented with an academic writing sample and a packet of evaluations from Professor Salaita's former students and his peers.

22.     Professor Salaita's student evaluations from Virginia Tech were stellar. They unequivocally demonstrate his commitment, skill and fairness as a teacher. Overall, he received the highest rating—"Excellent"—from his students over 90% of the time or more in almost every semester; he never received a rating below "Good." In the category of "concern and respect" for students, where students reflect on a teacher's fairness, receptivity to their concerns, and respect of differing viewpoints, Professor Salaita received the following ratings in each of six different courses:

   a) Course 1 (30 students): 28 Excellent; 2 Good.

   b) Course 2 (30 students): 30 Excellent.

   c) Course 3 (10 students): 10 Excellent.

d) Course 4 (29 students): 28 Excellent, 1 Good.

e) Course 5 (28 students): 28 Excellent.

f) Course 6 (28 students): 25 Excellent, 2 Good, 1 No Response.

23.     The search committee also consulted with experts in the field of Native American Studies from outside the University to obtain their evaluations of Professor Salaita as a scholar and teacher.

24.     Professor Salaita's scholarly and teaching accomplishments met the needs of the Program, and earned him an invitation to visit the University for an on-campus interview. He traveled to Champaign in the winter of 2013 to meet the search committee, Program faculty, graduate students, faculty from other departments who were potential scholarly collaborators for Professor Salaita, and some University administrators. He also gave a "job talk" to faculty and students—the traditional forum through which faculty can assess a candidate's intellect, creativity, and temperament.

*Offer and Acceptance*

25.     After interviewing and hosting similar visits from at least two other candidates, the search committee made its decision. On September 27, 2013, Brian Ross, then the interim dean of the College of Liberal Arts and Sciences, wrote to Professor Salaita to offer him a tenured position in the American Indian Studies Program at the University. One week later, on October 3, 2013, Dean Ross sent a revised offer letter that reflected the appropriate salary, and to which Professor Salaita responded. Dean Ross's offer letter stated that "[u]pon the recommendation of Professor Jodi Byrd, Acting Director of American Indian Studies, I am pleased to offer you a faculty position in that department at the rank of Associate Professor at an academic year (nine-month) salary of $85,000 paid over twelve months, effective January 01, 2014. This appointment

will carry indefinite tenure." Dean Ross's letter also conveyed that "this recommendation for appointment" was subject to approval by the Board of Trustees.

26.     The letter also stressed that the University "subscribe[s] to the principles of academic freedom and tenure laid down by the American Association of University Professors (AAUP)," and enclosed a copy of the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure.*

27.     Dean Ross also sent Professor Salaita a document entitled, "General Terms of Employment for Academic Staff Members," which included language stating that Professor Salaita "will receive a formal Notification of Appointment from the Board once the hiring unit has received back from the candidate all required documents, so the appointment can be processed." This document explained that such documents required by the Board for formal processing of Professor Salaita's appointment consisted of routine employment eligibility information and tax information. Dean Ross's letter went on to inform Professor Salaita that "[w]hen you arrive on campus, you will be asked to present proof of your citizenship," further suggesting that there were no other steps remaining in the hiring. At the bottom of the letter was a space for Professor Salaita's signature, below the statement "I accept the above offer of October 03, 2013." Dean Ross asked Prof. Salaita to return a signed photocopy of the letter "[i]f you choose to accept our invitation" to join American Indian Studies.

28.     On October 3, Professor Byrd likewise wrote to Professor Salaita, saying that she was "thrilled to send you this letter to supplement the offer letter you received from interim Dean Brian Ross." Professor Byrd went on to explain some of the resources that Professor Salaita would have available to him when he came to campus the following fall. She also explained that the Program "recognize[s] that you are a scholar in the height of your productivity," and for that

10

reason, the Program would arrange for Professor Salaita to have some time away from teaching in the near future to devote to his research. In addition, Professor Byrd "formally commit[ted] to working diligently to find [Professor Salaita's wife] Diana a career path at Illinois that will meet her needs."

29.  Professor Salaita discussed the offer with Professor Byrd and confirmed that he would be allowed to postpone his start date from the January 2014 timeframe in Dean Ross's offer letter to August 2014, so he could complete his teaching commitments at Virginia Tech. Professor Salaita then signed the statement of acceptance, dated it "10/9/13," and returned the signed offer-acceptance letter to Dean Ross.

30.  On October 9, Dean Ross sent a letter to Professor Salaita confirming that the University had received Professor Salaita's acceptance of its offer, and stating, "I look forward to your arrival on campus." The Program made Professor Salaita's selection public sometime in late October or early November of 2013.

31.  In addition to going through a rigorous process, Professor Salaita's appointment had also been approved by Chancellor Wise and the Provost of the University.

*Professor Salaita Resigns From Virginia Tech and Prepares to Move to the University of Illinois*

32.  After accepting the University's offer, Professor Salaita began working with Program faculty to prepare for his arrival. Salaita was scheduled to teach two courses in the Fall 2014 semester, Introduction to American Indian Studies and Indigenous Thinkers. He had been assigned an office, ordered course books and a new computer, and was coordinating with administrative staff to finalize his office furniture and obtain University identification. Students were able to enroll in his courses. Between the time he accepted the offer and August 2, 2014, he was in regular contact with Program faculty about his upcoming arrival on campus.

11

33.     Professor Salaita made a second visit to the campus with his wife and young son in March 2014 as a guest of the American Indian Studies Program. On that visit the Program hosted a dinner for him where he met again with most of the department faculty.

34.     In May 2014, Professor Salaita formally notified Virginia Tech that he would be leaving, effective in August. Professor Salaita's wife also resigned from her full-time job at Virginia Tech, and they arranged for a tenant to move into their Blacksburg residence after their departure.

35.     With the University's permission and blessing, and as is common in academia, Professor Salaita began to identify himself professionally with the University of Illinois during the summer of 2014. He presented papers at three conferences during the summer of 2014, and at all three, he was introduced and credentialed as an associate professor in the American Indian Studies Program at the University of Illinois.

36.     The University signaled repeatedly that it likewise already considered him a member of the faculty. In the late spring Chancellor Wise sent Professor Salaita an invitation to a fall reception for new faculty, addressed to him as a member of the American Indian Studies Program. In July 2014, University officials informed Professor Salaita that he was welcome to begin using his University of Illinois email account.

*Professor Salaita's Reliance on the University's Actions*

37.     The University's post-acceptance conduct, discussed above, further confirmed Professor Salaita's understanding that he was already a member of the University's faculty.

38.     Based on the communications and conduct above, as well as standard academic hiring practices, including practices at the University of Illinois, Professor Salaita reasonably

believed that approval of the Board of Trustees was a mere formality and that his position with the University of Illinois was certain so long as he remained legally eligible to work.

39.    The University's hiring practices are consistent with standard practices in academic hiring. Under those practices, a tenured professor recruited by a new university is expected to resign from an existing tenured position on the promise that the new university's trustees will ultimately confirm the tenured appointment. Academics (especially those who challenge conventional views) would be required to risk losing tenureship entirely if a new university's chancellor or board decided to overrule the faculty hiring committee's decision. The University's own Committee on Academic Freedom and Tenure, in its report criticizing the administration's actions in dismissing Salaita, recited as follows: "[O]ffers made by high administrative officers, a president or a dean, are customarily regarded as binding and [] any enervation of that reliability would throw the process by which colleges and universities engage new faculty members into complete chaos to the detriment of both institutions and faculty members." (Internal quotations omitted.)

40.    Under the norms governing University hiring, it is therefore virtually unheard of for a university's board to overrule a faculty hiring decision after the university has obtained the recruited faculty member's acceptance of an offer of a tenured position. On information and belief, it had never happened before at the University of Illinois.

41.    Professor Salaita further believed, consistent with the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure* and the University's "General Terms of Employment for Academic Staff Members," which the University referenced and sent to him as part of his offer, that he was entitled to the protections of the First Amendment, academic freedom principles and the University's Statutes.

13

*The University's Espoused Commitment to Free Speech and Academic Freedom*

42.     Like many universities across the country, the University of Illinois holds itself

out as committed to principles of academic freedom. The University of Illinois Statutes (the

"Statutes"), which govern the operation of the University, state that:

> It is the policy of the University to maintain and encourage full freedom within the law of
> inquiry, discourse, teaching, research, and publication and to protect any member of the
> academic staff against influences, from within or without the University, which would
> restrict the member's exercise of these freedoms in the member's area of scholarly
> interest.

Article X, § 2.a. of the Statutes (emphasis added).

43.     Academic freedom does not stop at the boundaries of the campus. The Statutes

further provide that "As a citizen, a faculty member may exercise the same freedoms as other

citizens *without institutional censorship or discipline*." Article X, § 2.b. of the Statutes.

44.     So strong is the University's espoused commitment to academic freedom and the

free speech rights of its faculty that, where it determines that a faculty member's exercise of those

rights is objectionable or reflects poorly on the University, the Statutes do not authorize, or even

contemplate, dismissing a faculty member for such speech. The Statutes state that, at most, the

University may distance itself from, or voice its disapproval of, the faculty member's comments.

Article X, § 2.c. of the Statutes.

45.     Article X, § 2 of the Statutes echoes the language of the American Association of

University Professors' ("AAUP") *1940 Statement of Principles on Academic Freedom and Tenure*.

Like many universities, the University of Illinois explicitly avows that it adheres to those

principles. In fact, a copy of the *1940 Statement* is given to newly-hired faculty—including

Professor Salaita himself—at the time they accept a tenured position with the University. As the

title of the Statement suggests, academic freedom is promoted chiefly through the institution of

14

tenure—indefinite appointment to the academic faculty, subject to removal only for adequate cause unrelated to the content, manner or viewpoint of the faculty member's speech and ideas, and only if pursuant to due process.

46.       The United States Supreme Court has underscored that protection of academic freedom is of constitutional significance, as it is vital to the American universities' unique commitment to fostering free thought and advancing knowledge: "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (internal citations omitted).

47.       Because tenure is a serious commitment on the part of a University to a scholar—one that a university reserves for scholars it truly believes will contribute to the University's academic mission and enhance its scholarly prestige—the process for selecting tenured faculty at the University of Illinois is rigorous.

48.       Under the Statutes, "[r]ecommendation to positions on the academic staff shall ordinarily originate with the department or . . . with the officers in charge of the work concerned." Article IX, § 3.d. of the Statutes. This provision reflects a second value of the University that is embedded in numerous provisions of the Statutes and indeed is required by the University's accreditors: shared governance. The AAUP, in its 1966 Statement on Government of Colleges and Universities, places special emphasis on responsibilities of a governing board of a multi-campus

university for "protecting the autonomy of individual campuses or institutions . . . and for implementing policies of shared governance."

49.     Shared governance—as between faculty and administration—ensures that new faculty are identified and recruited by those members of the University community best equipped to assess a candidate's academic credentials and scholarly potential. It also protects the integrity of the academic units of the University by insulating the hiring decisions of those units from external pressures, including the influence of the politically or financially powerful.

50.     Academic departments, which naturally have an interest in maintaining the reputation of their academic programs, subject prospective faculty members to careful screening, including interviews, job talks, campus visits, review of scholarly writing, review of former student and peer evaluations, and consultation with experts in the field outside the department.

51.     The faculty hiring process is thus almost entirely the province of the faculty departments and dean. This delegation of all but the ministerial role of finalizing faculty appointments is codified in the Statutes and communicated to faculty recruits.

52.     Once the department faculty have made a decision to appoint a scholar to a tenured position, the Statutes provide that the recommendation is then "presented to the dean of the college for transmission with the dean's recommendation to the chancellor/vice president," Article IX, § 3.d. of the Statutes, who in turn presents the recommendation to the Board of Trustees. "All appointments . . . *shall* be made by the Board of Trustees on the recommendation of the chancellor/vice president concerned and the president." Article IX, § 3.a of the Statutes (emphasis added).

53.     Consistent with the delegation of the faculty hiring process to the academic departments, the Chancellor's recommendation and the Board's approval are, and have been, a

16

mere formality at the University of Illinois. This delegation of substantive hiring authority by the Board to its academic faculty makes sense given that few, if any, of the members of the Board are academics themselves, and as such they are not competent to assesses the scholarly or teaching qualifications of individuals recommended for faculty appointments nor do they possesses the requisite expertise to evaluate field and departmental priorities. Indeed, so deferential is the Board to the academic judgment of University faculty that in the ordinary course, the Board will not vote to approve an appointment until *after* the new faculty member has arrived on campus and begun teaching. And all new academic hires—sometimes well over a hundred of them—are approved *en bloc*, in a single vote. Ordinarily, these new faculty members will not even be mentioned by name at the Board meeting, and very little information about them is needed or provided. The University's Committee on Academic Freedom and Tenure, in discussing the University's appointment process, stated as follows: "Until the September 2014 board meeting, the language of the board item for such appointments indicated that '[t]he following new appointments to the faculty at the rank of assistant professor and above, and certain administrative positions, have been approved since the previous meeting of the Board of Trustees and are now presented for your Confirmation.'"

54.     This is because the Board's action operates as a ratification of the informed decisions of the faculty. This voting procedure reflects the fact that the Board does not possess the competence to evaluate the academic credentials of the candidates that it is called upon to approve for hiring. The Board's role in ratifying faculty hiring decisions has never been viewed as an opportunity to second-guess or overturn the recommendations of the faculty involved in the hiring decision, as the values of academic freedom and shared governance do not permit such a process.

17

55. This process is so well established at UIUC that newly-recruited faculty such as Professor Salaita receive "General Terms of Employment" with the University's offer letter stating that "[n]ew academic staff members *will receive* a formal Notification of Appointment from the Board once the hiring unit has received back from the candidate all required documents, so the appointment can be *processed*" (emphasis added). The documentation referred to is nothing more than the sort of routine employment information necessary to confirm an individual's employment eligibility and to set up their tax withholdings and payments, such as a W-4, I-9, and direct deposit form.

56. Ultimately, the University's Committee on Academic Freedom and Tenure concluded it was likely that "none of those involved in the appointment process seriously considered that Board approval might be withheld."

57. Just as the selection of faculty for tenured positions is rigorous, so too is the process by which a tenured faculty member may be dismissed. "Due cause for dismissal shall be deemed to exist only if *(1)* a faculty member has been grossly neglectful of or grossly inefficient in the performance of the faculty member's university duties and functions; or *(2)* with all due regard for the freedoms and protections provided for in Article X, Section 2, of these Statutes, a faculty member's performance of university duties and functions or extramural conduct is found to demonstrate clearly and convincingly that the faculty member can no longer be relied upon to perform those university duties and functions in a manner consonant with professional standards of competence and responsibility; or *(3)* a faculty member has while employed by the University illegally advocated the overthrow of our constitutional form of government by force or violence." Article X, § 1.d. of the Statutes.

18

58.     Further, no tenured faculty member may be dismissed without, at a minimum, consultation by the President with the Faculty Advisory Committee, receiving a statement of the charges against the faculty member, and a hearing before the Committee on Academic Freedom and Tenure, at which the faculty member may be represented by counsel and may call witnesses in his or her defense. After the Committee on Academic Freedom and Tenure makes findings, conclusions, and a recommendation, the faculty member may object to them and may request a hearing before the University's Board of Trustees.

59.     As with the University's statement on academic freedom, these provisions for termination with cause also reflect the standards set out by the AAUP in its 1940 Statement. Interpreting that statement, the AAUP has stated that it regards the failure by a board of trustees to complete the appointment of a professor offered a tenured faculty position as a summary dismissal—*i.e.*, an action that violates procedural protections contemplated by the AAUP and the University's own standards. *See* August 29, 2014 letter from AAUP to Chancellor Phyllis Wise, attached hereto as Exhibit A.

### Professor Salaita's Protected Speech

60.     Professor Salaita has a personal Twitter account, which he used to share thoughts and ideas with his "followers," *i.e.*, other Twitter users who voluntarily sign up to receive his tweets (often family and friends). Twitter is a forum designed to facilitate instantaneous commentary and reactions to current events; in fact, Twitter describes its mission as "to give everyone the power to create and share ideas and information instantly, without barriers." Exchanges are informal and, with a 140-character limit, tweets are intended to be pithy; they are inherently not designed to capture nuance and subtly. As with many Twitter users, Professor Salaita's tweets span subjects as broad as his intellectual curiosity. Sometimes he uses Twitter to

share humor. But more often, he uses it to share unique ideas and to provoke thought. This sometimes consists of sharing his own viewpoints, and at other times consists of "re-tweeting" (forwarding to others) interesting writings of others.

61.     In recent years, Professor Salaita has used his Twitter account as an outlet for his thoughts and reactions to events in the Middle East. As an American citizen and as a person of Arab descent, Professor Salaita has long been concerned about American foreign policy in the Middle East and the issues surrounding the conflict between Israel and Palestine.

62.     Many of his tweets about Israel and Palestine are intended to challenge prevailing views of the issue and to bring texture to an increasingly politicized and polarized debate. And although Professor Salaita frequently disagrees with American and Israeli state policy in the region, his tweets take aim at state policy, not at any religious or ethnic group.  Neither his views nor his tweets are antisemitic. Indeed, Professor Salaita has used his Twitter account to expressly oppose antisemitism. For example, he has tweeted that he is fundamentally opposed to antisemitism, calling it a horror. And when the well-known rapper Macklemore wore a costume that evoked age-old Jewish stereotypes, Salaita took to his Twitter account to criticize the rapper for invoking an image used to dehumanize Jewish people for many centuries.

*July 2014 Hostilities in Gaza*

63.     In early July 2014, the state of Israel launched a military campaign in Gaza. Over more than six weeks, three Israeli civilians and 65 Israeli soldiers were killed, while the Israeli air and ground campaign took 2100 Palestinian lives. According to the United Nations, approximately 1500 of the Palestinians killed were civilians, including more than 500 children. Like many others, Professor Salaita was dismayed, particularly at the killing of children.

64.    Professor Salaita felt an obligation to speak out, and did so using his Twitter account. He usually sent the tweets from home in the evening after putting his son to bed. His habit was to read or watch accounts of what was happening in Gaza from sources such as The New York Times, The Guardian, Al Jazeera English, and a variety of social media, and tweet his reactions.

65.    He was disturbed by what he felt was widespread apathy and equivocation at the killing of children. Commensurately, his tweets were deeply critical of Israeli state policy and Israeli government leadership. He blamed Israeli Prime Minister Benjamin Netanyahu for the deaths of Palestinian children; and he criticized the Israeli policy of expanding settlements in territories captured during the 1967 War in contravention of international law. His tweets were provocative, often strongly-worded, and meant to challenge prevailing views and to shake people out of their moral slumber.

66.    Strong language aside, none of his tweets targeted criticism at Judaism or Jewish people. Indeed, his tweets make clear that his criticisms are directed at the policies and actions of the Israeli government, and are not grounded in any antipathy toward Jewish people or their religious beliefs. He explained, for example, that he refused to conceptualize the dispute between Israel and Palestine as a religious or ethnic conflict, stating further that he agreed with many Jewish people and disagreed with many Arabs.

67.    In one tweet, he explained the motivation for his speech, saying that there is no justification for the killing of children. He made clear that his view was universal, and reflected a belief that Jewish and Arab children are equal in the eyes of God.

*The University's Initial Reaction to Professor Salaita's Protected Speech*

68.    Around July 26, at the height of the Israeli campaign in Gaza, Robert Warrior, who is Director of the American Indian Studies Program, reluctantly contacted Professor Salaita to

21

relay a message from the Chancellor. Warrior told Salaita that according to Chancellor Wise, the University was aware of his tweets and would be monitoring his social media to ensure that he did not use University equipment to engage in that type of discourse. This admonition confirmed that Professor Salaita was already considered an employee of the University.

69.     Indeed, just a few days before, on July 22, the Urbana News-Gazette had quoted a university spokesperson as saying, in response to questions about Professor Salaita's tweets, that "faculty have a wide range of scholarly and political views, and we recognize the freedom-of-speech rights of all of our employees." The university spokesperson also wrote, "Professor Salaita will begin his employment with the university on Aug. 16, 2014. He will be an associate professor and will teach American Indian Studies courses."

70.     Professor Salaita continued to prepare for his move to Illinois, arranging for movers to pack up his home in Blacksburg, Virginia. As late as July 25, 2014, Professor Salaita was reassured that the University would cover the full cost of the move.

71.     Then, on August 2, 2014, just two weeks before his August 16th start date, and without any forewarning, Professor Salaita received an email enclosing a letter from Chancellor Wise and Vice President Christophe Pierre, dated August 1, informing him that "your appointment will not be recommended for submission to the Board of Trustees in September." Wise and Pierre offered no explanation at all for this decision, nor did they offer Professor Salaita notice of the reasons for his dismissal or an opportunity to be heard. The refusal to recommend him to the Board of Trustees for appointment was in direct contravention of the University's contractual promise to do so in Dean Ross's October 3 letter.

72.     Professor Salaita was shocked. He tried immediately to contact Robert Warrior to clarify exactly what the Chancellor's letter meant. Professor Warrior stated that he had only just

22

found out about the letter that same day. He expressed sympathy and concern for Professor Salaita and his family, and also told Professor Salaita that he was committed to seeing the appointment through.

73.     The impact of the University Administration's actions on Professor Salaita and his family was immediate. Without a job in Illinois—and without the promised funds to pay movers—Professor Salaita instead had to recruit family members to help him and his wife pack their home in a single day and move into his parents' home so that the tenant could move in. The Salaitas lost the earnest money that they had put down on a condominium in Illinois, as well as a deposit they had made with the University's premier day care center. The Salaitas no longer had any income.

74.     Ashamed to admit he had been fired, Professor Salaita initially told very few people about his termination.

75.     Then, on August 6, the online publication *Inside Higher Ed* revealed that the University Administration had terminated Professor Salaita's appointment. In the wake of that initial disclosure, other news outlets caught on to the story and began investigating, in several instances seeking documents from the University under the Freedom of Information Act. A disturbing narrative slowly emerged.

### The Decision to Terminate Professor Salaita

76.     Professor Salaita's tweets had reached a few media outlets supportive of Israeli policy. Beginning on July 21, 2014, these outlets began reprinting a handful of the most strongly worded tweets expressing criticism of Israeli policy and actions. The cherry-picked tweets that were published were taken in isolation and used to paint Professor Salaita as an antisemite and an advocate of violence. Professor Salaita is neither of these things. Not included were tweets in

which Professor Salaita denounced antisemitism, advocated non-violence, or affirmed the equality of Jews and Arabs.

77. Based on these few tweets, and the distorted picture of Professor Salaita that they were used to paint, several students, alumni, and donors wrote to Chancellor Wise. In their letters and emails, obtained under the Illinois Freedom of Information Act, they made clear that they disagreed with Professor's Salaita's views critical of Israeli policy.

78. Several of the writers openly stated that they would withdraw financial support from the University if it did not terminate Professor Salaita's appointment. One writer who described himself as a "multiple 6 figure donor" stated that his and his wife's "support is ending as we vehemently disagree" with Professor Salaita. Another writer informed the Chancellor that she and her husband would cease contributing to the University and would "let our fellow alumni know why we are doing so. We will encourage others to join us in this protest, as perhaps financial consequences will sway you...." Yet another donor, who noted that his name was on plaques on campus buildings based on his generous financial support, wrote to the Chancellor to say that he was reconsidering whether to continue donating to the University based on his strong disagreement with Professor Salaita's views regarding Israel.

79. On July 23, 2014, just one day after a University spokesperson had affirmed the University's commitment to Salaita's appointment, the Chancellor received an email from Steven Miller, the owner of a Chicago-based venture capital firm and a donor to the University. Miller is on the University's Business Council and the board of the Hillel Foundation, and has an Endowed Professorship in Business at the University of Illinois in his name. Miller asked to meet with Wise to "share his thoughts about the University's hiring of Professor Salaita." The Chancellor responded by telling Mr. Miller that she had "just recently learned about Steven Salaita's

24

background, beyond his academic history," and then rearranged her schedule to meet with Miller in Chicago on August 1.

80.     Also on July 23, 2014, Chancellor Wise met with an unknown donor, who gave her a two-page memo about Professor Salaita and urged the University Administration to terminate his appointment. That night, Chancellor Wise sent an email to several University's officials focused on fundraising to recount her meeting with the donor: "He gave me a two-pager filled with information on Professor Salaita and said how we handle the situation will be very telling."

81.     In contravention of the Illinois State Records Act, Chancellor Wise subsequently destroyed the two-page memo, notwithstanding that the document was presented to the Chancellor as part of an effort to influence the Chancellor's decision regarding her official duties.

82.     On July 24th, the Board of Trustees held a meeting in Chicago. In an executive session, they discussed Professor Salaita's tweets. Just before the meeting, the Board was provided with a handful of news stories about the tweets, but was given no other background material about Professor Salaita, his many other tweets, his scholarship or his teaching.

83.     As the Board began to discuss the matter, one of the student trustees used the internet to find the tweets that had been the subject of online news stories, and read them to the Board. The Board decided at the meeting that it would support a decision to terminate Professor Salaita's appointment. There was no consultation with the Dean of the College of Liberal Arts and Sciences, nor anyone in the American Indian Studies Program or involved on the search committee that hired him, nor was any effort made to evaluate Professor Salaita's statements on the Middle East, much less his academic scholarship, teaching credentials, or teaching evaluations. And certainly no one asked Professor Salaita for an explanation. The entire executive session lasted just ten minutes.

84.     Professor Salaita had no idea this meeting had taken place, and had no notion that his job was in jeopardy. After all, two days *after* this meeting, Professor Salaita obtained confirmation that his moving expenses would be covered.

85.     On August 1, in the morning, Chancellor Wise and Steven Miller were finally able to meet in person in Chicago. On information and belief, Mr. Miller informed the Chancellor that he would reduce or withhold his monetary contributions to the University if Professor Salaita was allowed to teach there. The Chancellor's letter of termination to Professor Salaita was dated the same day.

### The Negative Reaction and the University's Pretextual Reasoning

86.     As news of Professor Salaita's firing spread, sixteen departments within the University voted "no confidence" in the University's Administration. Robert Warrior and other faculty in the American Indian Studies Program expressed their strong support for Professor Salaita and urged the University to change course and reinstate him. Thousands of scholars from around the world announced their intention to boycott the University of Illinois on the grounds that it had violated cherished principles of academic freedom, free speech, and shared governance.

87.     On August 22, amid growing criticism of the University Administration, Chancellor Wise published an open letter to faculty in which she attempted to explain the firing of Professor Salaita. She admitted that the Administration's decision was based on Professor Salaita's tweets expressing his political opinions, but denied that the Administration had acted on the basis of Professor Salaita's viewpoints in those tweets. Instead, she claimed that the Administration's actions were taken because Professor Salaita's speech lacked "civility."

88.     The Board published a letter of support for the Chancellor the same day, also acknowledging that the University Administration's actions were taken based on Professor

Salaita's political speech, claiming that Professor Salaita's Twitter messages were "not an acceptable form of civil argument" and raising questions about his teaching ability. The Administration's claim of civility—based as it was on a handful of tweets—is concretely belied by the best and readily available evidence of his classroom and campus demeanor: his exceptional teaching evaluations from Virginia Tech specifically praise his temperament and openness to differing viewpoints at the highest levels of the teaching scale.

89.     Not only did the Board and the Chancellor admit that the Administration acted based on Professor Salaita's political speech, their statements justifying their decision are plain pretext. On information and belief, the University has never fired, let alone punished, a faculty member for "uncivil" speech outside of the classroom and campus, and not addressed to its students or faculty.

90.     Neither the Chancellor nor the Board made any reference to the pressure from donors to terminate Professor Salaita's appointment that had been taking place.

91.     With regard to the charge of antisemitism, a simple review of Professor Salaita's other tweets would have revealed that Professor Salaita is a vocal opponent of antisemitism. The University Administration made no effort to learn about these other, readily-available tweets, or Professor Salaita's views more generally.

92.     The Administration's other claim—that Professor Salaita's tweets rendered him "uncivil" and unfit to teach the University's students—was merely a defamatory means of justifying the decision to fire him for views the University officials did not like. Academics regularly engage in discussions that are provocative, and even sometimes unpleasant; indeed, universities have long been recognized as the place to challenge orthodoxy and push intellectual boundaries. And the hiring committee's dossier showed that Professor Salaita had a stellar

27

teaching record and that he had never been criticized for treating a student or colleague in the classroom or on campus unfairly, or with anything but utmost respect. Indeed, the University Administration provided no indication that it had investigated Professor Salaita's teaching record or scholarship before deciding to fire him. Moreover, Professor Salaita's tweets were sent from his personal Twitter account, from his home in Virginia, during a period in which he was not teaching any students. Professor Salaita has never mentioned his Twitter account to his students, let alone encouraged them to sign up to follow him.

93.     Finally, no one in the University Administration ever spoke to Professor Salaita to hear his side of the story. And the University Administration failed to consult the President of the Faculty Advisory Committee or conduct a hearing before the Committee on Academic Freedom and Tenure, as is required under the Statutes before a tenured faculty member can be dismissed.

94.     On September 11, 2014, after the school year had already begun, the Board of Trustees finally met to vote on the appointments of new faculty. This was the meeting in which the formality of completing Professor Salaita's appointment was supposed to occur. Indeed, the Board approved more than 120 tenured or tenure-track faculty members, almost all of whom had already begun working and teaching at the University on August 16, 2014. Not a single one of these appointees was mentioned by name during the meeting, and they were all voted on and approved at once.

95.     Solely because of his protected speech, Professor Salaita was treated differently. In contravention of the promises and commitments made to Professor Salaita to induce him to leave his previous tenured position for one at the University of Illinois, Chancellor Wise informed the Board that she was not recommending Professor Salaita for approval. To a chorus of "Shame, shame, shame" from the large crowd, the Board voted down Professor Salaita's appointment. The

vote was highly orchestrated, and a foregone conclusion, carried out solely to create the impression that the Administration had fulfilled its commitment. It had not. The Chancellor had already told Professor Salaita in her August 1 termination letter that she would not recommend him to the Board and that the Board would likely not approve him. Upon information and belief, her reversal of course, in which she put Professor Salaita's name up for a vote with a formal statement *not* recommending his appointment, has never before been done at the University.

96.     Trustee James Montgomery cast the lone dissenting vote. In the 1950s, Trustee Montgomery advocated and supported unpopular African-American causes while a student at the University, and faced condemnation for doing so. He analogized Salaita's speech to his own experience challenging prevailing views, describing himself as "almost as vocal as Dr. Salaita when I carried my picket signs along the streets of this campus."

97.     A few days after the meeting, Board Chairman Christopher Kennedy admitted in an interview with a newspaper that the decision to deny Professor Salaita his appointment to the faculty was based on Professor Salaita's tweets critical of Israeli policy. Kennedy made clear that he and the other Board members disagreed with Professor Salaita's strongly-worded criticisms of Israel's military campaign in Gaza—so much so that they chose to characterize them as antisemitic—and that they refused to complete his appointment on that basis.

98.     Defendant Kennedy twice stated to news publications that he believed the comments of Professor Salaita's that he reviewed were "anti-semitic" and "blatantly anti-semitic"—statements that were unfounded and contrary to available evidence that Kennedy chose not to review. This carelessly-leveled charge defamed Professor Salaita personally and professionally, and falsely caricatured Professor Salaita in contradiction to his nuanced and deeply researched and respected academic scholarship.

29

99.     Professor Salaita's tweets were not antisemitic, nor is he an antisemite. Had

Chancellor Wise and the Board of Trustees consulted the University's own expert faculty, for

example Professor Michael Rothberg, the Head of its own English Department and Director of the

University's Initiative in Holocaust, Genocide and Memory Studies, they might not have

committed such blatant viewpoint discrimination or defamed Professor Salaita. Professor Rothberg

wrote a thoughtful letter asking the Chancellor to complete Professor Salaita's appointment. He

wrote:

> While I continue to believe that political speech—no matter how controversial or
> extreme it might be considered—is protected by the First Amendment and the
> core values of Academic Freedom, I have also observed many interpretations of
> Professor Salaita's protected speech about the Israeli bombing of Gaza that I
> consider misguided and that deserve to be refuted. I strongly believe that neither
> Professor Salaita himself nor the tweets that are at issue are antisemitic. I say this
> as someone personally and professionally sensitive to expressions of
> antisemitism. Indeed, Professor Salaita has stated repeatedly in numerous tweets
> and writings that have not been cited by his detractors that he opposes
> antisemitism and racism of all kinds. I find these writings to be sincere and
> observe that nobody has brought a single piece of evidence to bear that would
> contradict Professor Salaita's explicit personal opposition to antisemitism. The
> tweets that have been reproduced again and again in reports on this case are not
> expressions of antisemitism but criticism of how charges of antisemitism are used
> to excuse otherwise inexcusable actions.

100.    In explaining his vote against Professor Salaita at the September 11 meeting,

Defendant Fitzgerald said he would have the same reservations about someone who posted

homophobic or racist remarks. Not only were Professor Salaita's statements not antisemitic, but

the University's record does not jibe with Fitzgerald's stated position. In 2012, University of

Illinois professor emeritus Robert Weissberg garnered headlines when he was fired by the National

Review Online for making racist comments in a speech at a gathering of white supremacists, a

meeting he had evidently been attending regularly for several years. Despite a public outcry, the

University took absolutely no action at all—not censure or condemnation, let alone termination.

30

Moreover, in 2010, the University initially fired adjunct religion professor Kenneth Howell for making homophobic statements in an email to students, but then re-hired Professor Howell and allowed him to continue teaching.

101.     Professor Salaita, in obvious contrast, remains without a job, without health insurance, in his parents' home, with his academic career in tatters. At the precise moment when he is "in the height of his productivity," he has been left without an institutional association that would allow him to conduct research and publish his scholarship. At the same time, the American Indian Studies Program has been left understaffed, and was forced to scramble to rearrange its fall course offerings. All this despite the fact that sixteen departments have voted no-confidence in the University's leadership after the decision to rescind Professor Salaita's appointment, and that Professor Warrior and the faculty of the American Indian Studies Program still support Professor Salaita and want him to join their ranks.

### Count I - 42 U.S.C. § 1983
### First Amendment
*Against the Trustee Defendants and Defendants Easter, Pierre, and Wise*

102.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

103.     In sending "tweets" regarding Israel and Palestine, from his personal Twitter account from his home in Virginia in the summer of 2014, Plaintiff acted in his capacity as a citizen, and not pursuant to any official university duties. His tweets never impeded his performance of his duties as a faculty member, or the regular operation of the University. The subject matter of the "tweets"—Israel and Palestine—is a matter of public concern, and Professor Salaita's comments about that conflict were made in an effort to contribute to the public debate. Such conduct is protected by the First Amendment of the United States Constitution.

104.    Plaintiff's protected speech, and the viewpoint he expressed in those tweets, though greatly distorted and misconstrued by Defendants, was a motivating factor in Defendants' decision not to recommend Professor Salaita's appointment and the rejection of Professor Salaita's appointment to the University's faculty.

105.    The University's retaliatory actions in response to Plaintiff's protected speech have had a chilling effect that acts as a deterrent to free speech.

106.    The termination of Professor Salaita's position with the University of Illinois directly resulted in substantial and irreparable harm to Professor Salaita, including the loss of a tenured position at the University, lost income, out of pocket expenses and severe emotional distress.

### Count II - 42 U.S.C. § 1983
### Procedural Due Process
#### *Against the Trustee Defendants and Defendants Easter, Pierre, and Wise*

107.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

108.    By virtue of the parties' contractual agreement, Professor Salaita's reliance on the University's promises, and the University's representations and actions, Plaintiff possessed a property interest in his appointment to and membership in the University's tenured faculty.

109.    Plaintiff also suffered a deprivation of his liberty interest as a result of the false and defamatory statements members of the University Administration made about Professor Salaita, in conjunction with the Administration's denial of his appointment to the University's faculty. The false and defamatory statements—including but not limited to public statements erroneously claiming that Plaintiff is antisemitic or bigoted, attacking his scholarship and

credentials, and asserting that he is unfit to teach—caused Professor Salaita to suffer substantial harm and stigma to his professional, intellectual and business reputation.

110.    Despite Plaintiff's property and liberty interest in his appointment to the University's tenured faculty and his employment with the University, he was not provided with and pre-termination procedures whatsoever, including notice of the charges, an explanation of the evidence against him, an opportunity to tell his side of the story, or to be heard by an impartial decision maker. Nor was he provided any post-termination procedures.

111.    Based on the manner in which Plaintiff's appointment and employment were terminated, he was denied any hearing or opportunity to challenge that action either before or after it was taken. The University thereby deprived Professor Salaita of a property interest and a liberty interest in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

112.    As a direct and proximate result of the University's denial of pre-termination or post-termination procedures, Professor Salaita suffered substantial and irreparable harm, including lost income, the loss of a tenured position at the University, out of pocket expenses and severe emotional distress.

### Count III - 42 U.S.C. § 1983 and 42 U.S.C. § 1985
### Conspiracy
### *Against all Defendants*

113.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

114.    All of the Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deny Professor Salaita's appointment to the University's faculty, all in violation of Plaintiffs constitutional rights, as described above.

115. In this manner, the Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

116. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

117. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

118. As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered substantial and irreparable harm, including lost income, the loss of a tenured position at the University, out of pocket expenses, and severe emotional distress.

### Count IV – State Law
### Promissory Estoppel
### *Against the Board of Trustees*

119. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

120. As described more fully above, Defendants made an unambiguous promise of employment with indefinite tenure to Professor Salaita. Defendants also made a promise of employment subject to approval consistent with an obligation of good faith and fair dealing, which, in context, included (but was not limited to) complying with (a) the First Amendment of the United States Constitution, (b) general principles of academic freedom and the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure* provided to Plaintiff with his offer, and (c) the University's own rules and regulations including the University of Illinois Statutes.

121. Professor Salaita relied on these promises when, among other instances of reliance, he resigned his tenured faculty position at Virginia Tech, his wife resigned her position,

he leased his residence in Blacksburg to a tenant, pulled their young son out of his school, and made a deposit on a new residence in Illinois. Professor Salaita would not have taken any of these actions in the absence of Defendants' promise of employment in a tenured faculty position.

122.     Professor Salaita's actions were of a definite and substantial character, and were both foreseeable and reasonably expected by Defendants.

123.     Professor Salaita relied on these promises to his detriment, suffering damages as a result of this breach, in an amount to be proved at trial, including the loss of his income, his wife's income, the loss of the earnest money deposit on a residence, moving expenses and other out of pocket costs.

**Count V – State Law**
**Breach of Contract**
*Against the Board of Trustees*

124.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

125.     As described more fully above, Professor Salaita formed a contract with Defendants by accepting their offer of employment in October 2013. Pursuant to the contract, the University agreed to recommend Professor Salaita to the Board of Trustees for appointment to the tenured faculty, and agreed that the appointment would be completed so long as Professor Salaita could meet ministerial requirements such as maintaining legal authorization to work in the United States.

126.     As described more fully above, Defendants' contractual obligations also included an obligation of good faith and fair dealing in performing the contract, which, in context, included (but was not limited to) complying with (a) the First Amendment of the United States Constitution, (b) general principles of academic freedom and the AAUP's *1940 Statement of Principles on*

*Academic Freedom and Tenure* provided to Plaintiff with his offer, and (c) the University's own rules and regulations including the University of Illinois Statutes.

127.     Professor Salaita substantially performed all of the contractual obligations that were required of him up to the time of breach.

128.     Defendants breached the contract by informing Professor Salaita that his nomination would not be recommended to the Board, by failing to recommend him to the Board for appointment, by voting against his appointment on impermissible and unlawful grounds, and terminating his employment.

129.     Moreover, in the performance of their contractual obligations to Salaita, Defendants also violated their obligations of good faith and fair dealing as to the terms and conditions of that contract.

130.     Professor Salaita suffered damages as a result of this breach, in an amount to be proved at trial, including the loss of his income, his wife's income, the loss of the earnest money deposit on a residence, moving expenses and other out of pocket costs.

**Counts VI and VII – State Law**
**Tortious Interference with Contractual and Business Relations**
***Against John Doe Donor Defendants***

131.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

132.     As described more fully above, John Doe Donor Defendants had knowledge of the University's contract with Professor Salaita and their commitment to complete his appointment to the University's faculty.

133.     John Doe Donor Defendants wrongfully, intentionally, and without just cause, demanded that the University terminate Professor Saliata's employment and refuse to complete his

36

appointment to the University's faculty, or else risk losing their financial contributions to the University. By doing so, they induced Chancellor Wise and others not yet known to Professor Salaita, as agents of the University, to breach their contract, violate Professor Salaita's constitutional rights, and destroy his job and business prospects.

134.    Professor Salaita suffered damages as a result of this breach, in an amount to be proved at trial, including the loss of his income, his wife's income, the loss of the earnest money deposit on a residence, moving expenses and other out of pocket costs.

**Count VIII – State Law**
**Intentional Infliction of Emotional Distress**
***Against all Defendants***

135.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

136.    In the manner described more fully above, by inducing Professor Salaita to resign from his tenured faculty position at Virginia Tech and then abruptly terminating his position with the University of Illinois days before his arrival on campus to begin teaching, the Board, the Trustee Defendants and Defendants Easter, Pierre and Wise engaged in extreme and outrageous conduct.

137.    In the manner described more fully above, by interfering in Professor Salaita's appointment to the University's faculty, demanding that the University terminate his position, and issuing an ultimatum that the University must deny his appointment or else lose their financial support, all despite having knowledge of the University's contract and commitment to appoint Professor Salaita to the faculty, the John Doe Donor Defendants engaged in extreme and outrageous conduct.

138.    Defendants' actions set forth above were rooted in an abuse of power or authority.

139.     Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

140.     Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

141.     As a direct and proximate result of this misconduct, Professor Salaita suffered injuries, including severe emotional distress and great conscious pain and suffering prior to his death.

### Count IX – State Law
### Spoliation of Evidence
### *Against Defendant Wise*

142.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

143.     As described above, Defendant Wise participated in the intentional destruction and spoliation of evidence central to this lawsuit, including but not limited to the two-page document about Professor Salaita given to her by an unknown donor.

144.     Defendant Wise and the University had a duty under 5 ILCS 160/1 *et seq.* to preserve evidence related to the denial of Professor Salaita's appointment to the University's faculty.

145.     Defendant Wise's destruction of the memo and any other evidence interfered with Professor Salaita's ability to prove his claims, thereby causing him further damages.

146.     Prior to destroying this and other relevant evidence, Defendant Wise knew of the existence of a potential cause of action against her and the University, and intended in destroying this evidence to interfere with Plaintiff's ability to prove his lawsuit. The misconduct described in

this Count was undertaken intentionally with malice and reckless indifference to the rights of others.

*       *       *

147.     Because the Trustee Defendants and Defendants Easter, Pierre and Wise acted within the scope of their employment, the Board of Trustees and the State of Illinois are therefore liable as their employer for any resulting damages and award of attorneys' fees.

WHEREFORE, Plaintiff Steven Salaita respectfully requests that the Court enter judgment in his favor and against all Defendants, for preliminary and permanent injunctive and equitable relief including but not limited to reinstatement by completing his appointment to the tenured faculty; and for monetary relief including compensatory damages, punitive damages, and attorneys' fees and costs, and for any other relief that this Court deems just and proper.

Dated:  January 29, 2015                        Respectfully submitted,

                                                 _____
                                                 One of Plaintiff's Attorneys

Maria LaHood (*pro hac vice* application pending)     Jon Loevy
Baher Azmy (*pro hac vice* application pending)       Arthur Loevy
Omar Shakir (*pro hac vice* application pending)      Anand Swaminathan
THE CENTER FOR CONSTITUTIONAL RIGHTS                  Gretchen Helfrich
666 Broadway                                          LOEVY & LOEVY
7th Floor                                             312 North May Street
New York, NY 10012                                    Suite 100
Phone: 212-614-6464                                   Chicago, IL 60604
Fax: 212-614-6499                                     Phone: 312-243-5900
                                                      Fax: 312-243-5902

39

# EXHIBIT A



**aaup**
AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

1133 19th Street, NW, Suite 200, Washington, DC 20036
PHONE: 202.737.5900 • FAX: 202.737.5526 • www.aaup.org

August 29, 2014

<u>VIA U.S. AND ELECTRONIC MAIL</u>

Dr. Phyllis Wise
Chancellor, University of Illinois Urbana-Champaign
Swanlund Administration Building
601 East John Street
Champaign, Illinois 61820

Dear Chancellor Wise:

Dr. Steven Salaita has sought the assistance of the American Association of University Professors pursuant to your letter of August 1, 2014, informing him that you would not be recommending the tenured faculty appointment offered to him on October 3, 2013, to the board of trustees for its approval and stating, "We believe that an affirmative Board vote approving your appointment is unlikely."

The Association's interest in Professor Salaita's case stems from its longstanding commitment to academic freedom and tenure. The basic tenets, as you know, are set forth in the attached joint 1940 *Statement of Principles on Academic Freedom and Tenure*, to which the University of Illinois subscribes. Also attached are the complementary joint 1958 *Statement on Procedural Standards in Faculty Dismissal Proceedings* and the AAUP's derivative *Recommended Institutional Regulations on Academic Freedom and Tenure*.

\* \* \* \* \*

From the information provided to us by Professor Salaita, others at the University of Illinois, and media sources, we understand that he was offered an appointment as an associate professor with tenure at the University of Illinois at Urbana-Champaign, initially to begin January 1, 2014. The offer was made in a letter dated October 3, 2013, from Dr. Brian H. Ross, interim dean of the College of Liberal Arts and Sciences upon the recommendation of Professor Jodi Byrd, then the acting-director of the American Indian Studies Program (AIS) for which Professor Salaita was recruited. In this letter, Interim Dean Ross stated that the recommendation for appointment was "subject to approval by the Board of Trustees of the University of Illinois." He nonetheless asked for Professor Salaita's decision by October 14 and directed him to return "a photocopy of this letter with the form at the bottom completed and signed," should he accept the appointment. He then wrote:

At the University of Illinois, like at most universities in this country, we

Chancellor Phyllis Wise
August 29, 2014
Page 2

subscribe to the principles of academic freedom and tenure laid down by the American Association of University Professors (AAUP). The *Statement on Academic Freedom and Tenure* has been since 1940 the foundation document in this country covering the freedoms and obligations of tenure. The AAUP *Statement on Professional Ethics* is a document of similarly broad application to those in academia. I am enclosing copies of these documents for your information, and commend them to your attention.

On October 9, Professor Salaita wrote to Interim Dean Ross accepting the appointment and returning a copy of the signed offer letter. With the interim dean's concurrence, he states, he amended the effective date to August 16, 2014, in order to enable him to complete the academic year at Virginia Polytechnic Institute and State University, where he was then serving on the faculty as a tenured associate professor. After accepting the appointment, Professor Salaita resigned his tenured position. Shortly thereafter, and throughout the spring and early summer, he engaged in e-mail correspondence with incoming AIS program director Professor Robert Warrior and the program assistant regarding matters related to his fall 2014 course assignments, schedule preferences, and book orders. Toward the end of January, Professor Salaita wrote to Professor Byrd about scheduling a visit to Urbana-Champaign in order to make arrangements for a place to live for him and his family. He states that they visited the area in March and subsequently initiated the purchase of an apartment, including payment of "earnest" money, which was subsequently forfeited when the agreement was voided following the abrupt notification regarding his appointment. During this visit, the AIS faculty hosted a dinner for him and his family to welcome him to the faculty. In early April he was notified of his fall teaching assignment, and he finalized his course book orders in mid-summer.

In the intervening months between his October 2013 acceptance of the appointment and early August 2014, when you notified him of its termination, Professor Salaita received information from various offices of the university, indicating that they had been informed of his appointment, including an invitation from your office to attend your August 19 reception "welcoming faculty and academic professionals who joined the Illinois community in 2014," as the invitation stated. Nothing was said to Professor Salaita about board action still to come, and we are informed that it is not uncommon for board action on new appointments to take place only after the appointment has begun and the appointee is already at work.

*     *     *     *     *

We are deeply concerned about the action taken against Professor Salaita. Long after he was offered and accepted a tenured position, specific arrangements were made regarding courses, schedules, and salary. The exchange of letters between Interim Dean Ross and Professor Salaita appears to have been in accordance with generally established procedures by which academic appointments are tendered and accepted. Ten months elapsed during which time no one in the university administration gave any indication that the appointment as agreed upon might not be brought before the board. Only this August, after Professor Salaita had resigned his tenured position at Virginia Tech, prepared for his assignments, and shortly before the semester was to begin did he receive notification asserting that, because the board of trustees would not be acting on the matter, he did not have an appointment at the University of Illinois. Aborting an appointment in this manner without having demonstrated cause has

Chancellor Phyllis Wise
August 29, 2014
Page 3

consistently been seen by the AAUP as tantamount to summary dismissal, an action categorically inimical to academic freedom and due process and one aggravated in his case by the apparent failure to provide him with any written or even oral explanation. As an AAUP 1964 investigating committee report on a similar faculty dismissal at the University of South Florida concluded, the academic community cannot condone an appointment procedure which enables a university

> to offer a professor a position during normal appointment "season" and then, after he has accepted the position, to cut him adrift without warning or hearings. . . . This committee sees no way in which the academic marketplace could operate in a rational and just way if the practices followed . . . were accepted as normal procedure.

The University of South Florida, the investigating committee further concluded, had a "moral and professional obligation" to support the faculty member's appointment by its board of trustees in formal action, and its failure to do so constituted for all practical purposes a dismissal. The AAUP's 1964 annual meeting imposed censure on this basis, which the 1968 annual meeting removed after the university provided redress to the professor and adopted procedures consistent with Association-supported standards.

While the administration has not provided an explanation for the actions against Professor Salaita, it seems evident from media and other accounts that the actions have been publicly seen as having been triggered by his posting on social-media websites which were condemnatory of Israeli government practices in recent months. We are not privy to the circumstances under which information regarding his statements was discovered and distributed, we do not know what motives were involved, nor is it for us to render a judgment on the substantive merits of those statements, but we sharply question whether they meet the standard, set forth in Regulation 5a of the AAUP's *Recommended Institutional Regulations on Academic Freedom and Tenure*, that cause for such actions "be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers."

We see Professor Salaita's online statements as extramural activity as a citizen rather than as faculty performance, and the 1940 *Statement of Principles* cautions that when faculty members "speak or write as citizens they should be free from institutional censorship or discipline. . . ." The document goes on to explain that faculty members should nonetheless act responsibly as citizens and (in its 1940 Interpretation No. 3) states that an administration may bring charges if it believes that these admonitions have not been observed "such as to raise grave doubts concerning the teacher's fitness for his or her position," but that in doing so it "should remember that teachers are citizens and should be accorded the freedom of citizens." We see that a very serious issue of academic freedom has been raised by the actions against him, an issue that will not be resolved as long as the actions remain in effect and their soundness has not been demonstrated by the University of Illinois administration under requisite safeguards of academic due process.

We understand that an issue has arisen regarding the legitimacy of Professor Salaita's tenure absent board of trustees' approval. We have been informed that the university's Committee on Academic Freedom and Tenure (CAFT), acting under its statutory authority, has decided to initiate an examination of the issues posed by the Salaita case.

Chancellor Phyllis Wise
August 29, 2014
Page 4


We appreciate that the information on which this letter is based has come to us largely from Professor Salaita and that you may well yourself have information that would add to our understanding of what has occurred. We shall accordingly welcome your comments. Until these issues have been resolved, we look upon Professor Salaita's situation as that of a faculty member suspended from his academic responsibilities pending a hearing on his fitness to continue. Under the joint 1958 *Statement on Procedural Standards in Faculty Dismissal Proceedings,* any such suspension is to be with pay. As detailed earlier in this letter, Professor Salaita has incurred major financial expenses since he accepted the University of Illinois offer. We urge – indeed insist – that he be paid salary as set in the terms of the appointment pending the result of the CAFT proceeding.

We would welcome a prompt response.

Sincerely,

Anita Levy, Ph.D.
Associate Secretary


Enclosures via E-mail

cc: Mr. Christopher Kennedy, Chair, Board of Trustees
Interim Dean Brian H. Ross
Professor Robert Warrior, Director, American Indian Studies Program
Professor Jodi Byrd
Professor David J. O'Brien, Chair, Committee on Academic Freedom and Tenure
Professor Roy Campbell, Chair, Senate Executive Committee
Professor Bruce Rosenstock, Chair, Campus Faculty Association
Professor Steven Salaita
Professor Michael Harkins, President, Illinois AAUP Conference
Professor Peter Kirstein, Chair, Illinois AAUP Conference Committee on Academic
    Freedom and Tenure
Professor John Prussing, President, UIUC AAUP Chapter

Name:_____Date:_____

## Who Is Jesus Christ? (Intro A) Bill Bright

Many people do not believe the Bible, yet it miraculously foretells hundreds of events, sometimes in specific detail, and usually hundreds - sometimes thousands - of years ahead. Some prophecies concern cities and countries. Others relate to specific individuals. Many have already been fulfilled, but some are still in the future.

Jesus Christ is the subject of more than 300 Old Testament prophecies. His birth, nearly 2,000 years ago, and events of His life had been foretold by many prophets during a period of 1,500 years. History confirms that even the smallest detail happened just as predicted. It confirms beyond a doubt that Jesus is the true Messiah, the Son of God and Savior of the world.

## Old Testament prophecies fulfilled in Jesus

The following lists some of the amazing predictions concerning Jesus Christ, together with the record of their fulfillment:

### His Birth

Old Testament prophecy: Isaiah 7:14 (600 years before Jesus' birth!)
Fulfillment in Jesus: Matthew 1:18, 22, 23

### His Birthplace

Old Testament prophecy: Micah 5:2 (700 years before Jesus' birth!)
Fulfillment in Jesus: Luke 2:4-7

Main idea:

Where was Jesus born?

### The Purpose for His Death

Old Testament prophecy: Isaiah 53:1-6 (600 years before Jesus' death, remember?)

(Isaiah's Suffering Servant prophesy actually begins in chapter 52)

:4

:5

:6

Fulfillment in Jesus: 1 Peter 2:24

### His Betrayal

Old Testament prophecy: Zechariah 11:12-13; 13:6 (500 years before)

Fulfillment in Jesus: Matthew 26:14-16; 48-50

Intro a page 1

**His Crucifixion**
Old Testament prophecy: Psalm 22:1-18 (by King David 28 generations - about 1000 years BEFORE Jesus was born!)

Fulfillment in Jesus: Matthew 27:29-46 Put the verse # that fulfills the prophecies next to each one (Read Psalm 22, then Matthew, then look at them together – maybe one paper Bible and one electronic)

:1

(Matthew 27: ___)

:7

(Matthew 27: _____)

:8

(Matthew 27: ___)

:18

(Matthew 27: ___)

Three prophecies that are specifically about death by crucifixion:

:14

:15 (also see John 19:28)

:16

**His Resurrection**
Old Testament prophecy: Psalm 16:9-10 (about 1000 years before Jesus's death) ("Sheol" means _____)

Fulfillment in Jesus: Acts 2:22-32 (Peter's sermon at Pentecost)

**The Claims of Jesus Concerning Who He Is**
1. What are the claims Christ made concerning Himself in the following verses:
   a. Mark 14:61-62 (Jesus before the chief priests, elders, and scribes)

    1)

    2)

   b. John 5:17-18 (read 5:1-18)

    1)

    2)

   c. John 6:38 (after the 5000+ fed)

   d. John 8:42

   e. John 8:48-59

    :58

   (*notice verse 59 – why would they do this?)

    compare Exodus 3:13-14 (Moses talks with God)

Intro a page 2

f. John 10:30-33

:33 response of the Jews

1. What did Jesus claim to **do** in the following verses?
   a. John 5:22

   b. Matthew 9:2-8

   :6

2. What did Jesus **predict** in the following verses?
   a. Mark 9:31 (3 things)

   b. Luke 18:31-33 (7 things)

   c. John 14:1-3 (3 things)

   :2

   :3

What characteristics of Jesus are attributes of an omniscient (all-knowing), omnipotent (all-powerful) God?

a. John 2:24-25

b. Matthew 8:23-27

c. John 11:43-45 (read :1-45)

According to the passages before, Jesus **claimed to be God.** He made the kinds of claims that only a person who presumed he was God would make. Both His **friends** and His **enemies called Him God.** He **commended His followers for believing He was God.**

The Importance of the Truth About His Identity

1. Suppose Jesus Christ were not God. If He knew He was not God and that none of those claims were true, what could we conclude about Him?

2. Suppose Jesus was sincerely wrong. Suppose He sincerely believed all these fantastic claims, even though they were not true. What could we conclude about Him?

Intro a page 3

3. Why is it important to investigate His claims?

> **Lord** = _____ of _____

f. How does Christ's response to what Thomas said (verse 29) **apply to you**?

**What Others Said About Who He Was**

1. What did His **followers** say about Jesus?

a. John the Baptist (John 1:29)

b. Peter (Matthew 16:15-16)

c. How did Jesus respond to what Peter said? (verse 17)

d. Martha (John 11:27)

e. Thomas (John 20:28)

g. Paul (2 Corinthians 5:21)

1. His **enemies**:
   a. The Jews (John 10:33)

b. Judas (Matthew 27:3-4)

c. The Roman Soldier (Matthew 27:54)

2. Who do **you** believe Jesus is?

On what do you base that belief?

Go back to the beginning of this study and circle the facts that particularly help you know that He is God.

**Memorize** John 14:6 (NIV) Jesus answered, "I am the way and the truth and the life. No one comes to the Father except through me."

## Life Application

1. Why is it important that you personally recognize **who** Jesus Christ really is?

Please copy the memory verse several times.

_____

_____

2. Have you invited Jesus Christ into your life? (Mark 1:15; Acts 3:19)

_____

3. What are the two things He wants us to do?

_____

_____

**Repent** means: _____

_____

_____

_____

4. What **changes** do you **expect** to experience in your life as a result of receiving Christ as your Savior and Lord?

_____

_____

_____

_____

_____

_____

_____

Intro a page 5



State of Illinois
Department of Human Services

| | |
|---|---|
| Appeal Number: | 2400601820 |
| RE: | ROSE MEACHAM |
| Date of Notice: | 06/26/2024 |
| Office Name: | Appeals DHS Office |
| Office Address: | 69 W WASHINGTON 4 |
| | CHICAGO, IL 60602 |
| Bureau Email: | DHS.BAH@illinois.gov |
| Phone: | (800) 435 - 0774 |
| TTY: | (877) 734 - 7429 |
| Fax: | (312) 793 - 3387 |

**You can manage your appeal online at**
**https://abe.illinois.gov/abe/access/appeals**

ROSE MEACHAM
730 W LAKE ST
CHICAGO, IL 60661

# Appeal Dismissed

An appeal hearing was scheduled pursuant to you and/or your representative's request. You and/or your representative did not appear at the scheduled time and place or refused to proceed with the hearing. Therefore, the appeal is now considered as abandoned, and for such reason the appeal has been dismissed. If the appeal has been withdrawn, this notice may be disregarded.

If you and/or your representative still wish to have a hearing, the appeal may be continued to a new date. This request must be writing within ten (10) days of the date on this dismissal notice, and present good cause in writing for failing to appear or proceed at your previous appeal hearing. Please send your request to:

69 W WASHINGTON 4
CHICAGO, IL 60602

Or email to: DHS.BAH@illinois.gov

Or fax: (312) 793-3387

Or online to: https://abe.illinois.gov/abe/access/appeals

"Good Cause" for failing to appear or proceed at a scheduled hearing is determined by the Appeals Office as existing when your failure resulted from one of the following:

A.  Death in the family.
B.  Personal injury or illness which reasonably prohibits attendance at the hearing.
C.  Sudden and unexpected emergency or other circumstances beyond your control that reasonably prevented you from attending the hearing.

If the Appeals Office does not vacate this dismissal, this is a final administrative decision. This disposition by dismissal is reviewable only through the Circuit Courts of the State of Illinois. It does not affect the right to appeal from any other action deemed adverse. The time the courts will allow for filing for such review may be as short as 35 days from the date of this letter.

Turn this page over to read more information on the back.



Dulce Quintero
Secretary
Department Of Human Services

CC: Amanda, Saldana, Appeals DHS Office - Yolanda, Blevins, Appeals DHS Office - Nellie, Marroquin, Appeals DHS Office - Wanda, Thomas, Appeals DHS Office - Lydiamo, Zhang, Appeals DHS Office - David, Ellis, Appeals DHS Office - David, Olmos, Appeals DHS Office - Thadrenia, Yarbrough, Appeals DHS Office - Kenis, Williams, Appeals DHS Office - Carmen, Lebron, Appeals DHS Office - Rochelle, Colston, Appeals DHS Office - Hayward, Man, Appeals DHS Office - Melanie, Henry, Appeals DHS Office - Chimika, Stanback



| | |
|---|---|
| Número de apelación: | 2400601820 |
| RE: | ROSE MEACHAM |
| Fecha: | 06/26/2024 |
| Nombre de la oficina: | Appeals DHS Office |
| Dirección de la oficina: | 69 W WASHINGTON 4 |
| | CHICAGO, IL 60602 |
| E-mail del Departamento: | DHS.BAH@illinois.gov |
| No. de teléfono: | (800) 435 - 0774 |
| TTY: | (877) 734 - 7429 |
| Fax: | (312) 793 - 3387 |

ROSE MEACHAM
730 W LAKE ST
CHICAGO, IL 60661

**Usted puede manejar su apelación en línea en**
**https://abe.illinois.gov/abe/access/appeals**

# Notificación de Desestimación

Una audiencia de apelación estaba programada de conformidad con la solicitud de usted y/o su representante. Usted y/o su representante no se presentó al lugar, fecha y hora programada o se negó a proceder con la audiencia. Por lo tanto, la apelación se considera abandonada, y por tal razón su apelación ha sido desestimada. Si la apelación fue retirada, puede hacer caso omiso a esta notificación.

Si usted y/o su representante aun desean tener una audiencia, la apelación se puede continuar a una nueva fecha. Esta solicitud debe ser por escrito dentro de diez (10) días siguientes a la fecha de este aviso de desestimación, y demostrar por escrito una justa causa por no presentarse o proceder en su audiencia de apelación anterior. Por favor envié su solicitud a:

69 W WASHINGTON 4
CHICAGO, IL 60602

O por correo electrónico a: DHS.BAH@illinois.gov

O por fax: (312) 793-3387

O por nuestra página de internet a través de https://abe.illinois.gov/abe/access/appeals

"justa causa" por no presentarse o proceder en su audiencia programada, es determinada por la Oficina de apelaciones como existente cuando su fallo se debe a uno de los siguientes:

A) Muerte de un familiar.

B) Lesiones o enfermedades personales que impidan razonablemente su asistencia a la audiencia.

C) Emergencia imprevista e inesperada u otras circunstancias fuera de su control que razonablemente le impidan asistir a la audiencia

Si la oficina de apelaciones no revoca esta desestimación, esta constituye una decisión administrativa final. Esta disposición por desestimación es revisable solo a través de las Cortes de Circuito del Estado de Illinois. Esto no afecta el derecho de apelar cualquier otra acción que considere adversa. El término que la Corte de Circuito permitirá para la presentación de dicha revisión puede ser tan corto como treinta y cinco (35) días a partir de la fecha de esta carta.

Lea la información al reverso de esta página.



Dulce Quintero
Secretaria
Departamento de Servicios Humanos

CC: Amanda, Saldana, Appeals DHS Office - Yolanda, Blevins, Appeals DHS Office - Nellie, Marroquin, Appeals DHS Office - Wanda, Thomas, Appeals DHS Office - Lydiamo, Zhang, Appeals DHS Office - David, Ellis, Appeals DHS Office - David, Olmos, Appeals DHS Office - Thadrenia, Yarbrough, Appeals DHS Office - Kenis, Williams, Appeals DHS Office - Carmen, Lebron, Appeals DHS Office - Rochelle, Colston, Appeals DHS Office - Hayward, Man, Appeals DHS Office - Melanie, Henry, Appeals DHS Office - Chimika, Stanback

